*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0011P (6th Cir.)
File Name: 03a0011p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

VICTOR M. JAVITCH,
Receiver,

     *Plaintiff-Appellee,*

    *v.*

FIRST UNION SECURITIES,
INC.; MICHAEL D'ANGELO
(02-3352); CHARLES SCHWAB
& COMPANY, INC.; CHARLES
HARRIS (02-3353); MORGAN
STANLEY DEAN WITTER &
COMPANY; MARCEL POPE
(02-3354); FIFTH
THIRD/MAXUS SECURITIES,
INC. (02-3355),

    *Defendants-Appellants.*

Nos. 02-3352/
3353/3354/3355

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
Nos. 01-00780; 01-01015; 01-01077; 01-01126—
David A. Katz, District Judge.

Argued: December 3, 2002

Decided and Filed: January 10, 2003

1

Before:  GUY and BOGGS, Circuit Judges; EDMUNDS,
                    District Judge.*

———————————

**COUNSEL**

———————————

**ARGUED:**    Michael N. Ungar, ULMER & BERNE,
Cleveland, Ohio, for Appellants.  Matthew P. Moriarty,
BRZYTWA, QUICK & McCRYSTAL, Cleveland, Ohio, for
Appellee. Ida W. Draim, DICKSTEIN, SHAPIRO, MORIN
& OSHINSKY, Washington, D.C., for Amicus Curiae.
**ON BRIEF:** Michael N. Ungar, Suzanne E. Duddy, Timothy
J. Downing, ULMER & BERNE, Cleveland, Ohio, for
Appellants. Matthew P. Moriarty, Robert E. Cahill, Roger A.
Hipp, BRZYTWA, QUICK & McCRYSTAL, Cleveland,
Ohio, for Appellee.  Ida W. Draim, Frank C. Razzano,
DICKSTEIN, SHAPIRO, MORIN & OSHINSKY,
Washington, D.C., for Amicus Curiae.

———————————

**OPINION**

———————————

   RALPH B. GUY, Jr., Circuit Judge.  The brokerage firms
and individual brokers named as defendants in four related
actions have brought interlocutory appeals from the district
court's denial of their motions to compel arbitration of claims
asserted by plaintiff, Victor M. Javitch, as the receiver for
Viatical Escrow Services, LLC (VES), and Capital Fund
Leasing, LLC (CFL).[1]  The district court found that Javitch,
the receiver, could not be compelled to arbitrate any of the

———————————

*The Honorable Nancy G. Edmunds, United States District Judge for
the Eastern District of Michigan, sitting by designation.

[1]The Securities Industry Association, Inc., filed a brief as *amicus
curiae* in support of reversal.

a nonsignatory, to the arbitration agreements, we vacate and remand for further consideration of this issue.

The district court's decisions denying the defendants' motions to compel arbitration are **VACATED** and the cases are **REMANDED** for further proceedings consistent with this opinion.

claims against the defendants because (1) Javitch did not personally sign the agreements containing the mandatory arbitration clauses, (2) the complaints challenged the validity of the agreements, and (3) he could not be bound to the arbitration agreements under ordinary contract and agency principles. Defendants argue that the receiver is bound either because he "stands in the shoes" of VES and CFL, or because he should be estopped from refusing to arbitrate claims that arise from the broker-customer relationship. After review of the record and the arguments presented on appeal, we VACATE the district court's orders denying the motions to compel arbitration and REMAND for further proceedings consistent with this opinion.[2]

## I.

Javitch was appointed as receiver for VES and CFL in the case of *Liberte Capital Group, LLC v. James A. Capwill*, C.A. No. 99-CV-00818 (N.D. Ohio Jul. 15, 1999) (order appointing receiver). In that case, Liberte Capital and Alpha Capital claimed that James A. Capwill and entities he controlled (including VES and CFL) participated in a scheme to defraud viatical funding companies and viatical investors.[3] The receiver was appointed "to oversee and to administer the business and assets of VES and CFL," with the objective to "preserve and increase the estate for the benefit of all the creditors, investors, owners and parties to this case." Among the powers enumerated in the order, the receiver was authorized,

---

[2]An appeal may be taken from an order denying a motion to compel arbitration under 9 U.S.C. § 16(a)(1) (formerly § 15(a)(1)). *See Arnold v. Arnold Corp.*, 920 F.2d 1269, 1274 (6th Cir. 1990).

[3]A viatical settlement is an investment contract that purchases the death benefit of a life insurance policy of a terminally ill person at a discount. The price of the investment includes the funds to be paid to the owner of the policy, as well as funds to be held in escrow to pay the life insurance premiums.

upon application and approval by the Court, to institute, prosecute, defend, intervene in, become party to, compromise or settle all such cases and proceedings as are in the Receiver's opinion necessary or proper to preserve or protect the Receivership property or to carry out the terms of this Order, whether such cases and proceedings are now pending or hereafter brought by or against the Receiver in his capacity as Receiver of VES and/or CFL, against VES, or against CFL in state or federal courts or administrative agencies or other forums[.]

Under this authority, Javitch commenced these actions against the following defendants: First Union Securities, Inc. (f/k/a Everen Securities), and one of its brokers, Michael D'Angelo (First Union); Charles Schwab & Co., and one of its brokers, Charles Harris (Schwab); Morgan Stanley Dean Witter & Co., and one of its brokers, Marcel Pope (MSDW); and Fifth Third/Maxus Securities, Inc. (Maxus).

Each of the complaints aver that Capwill provided services to viatical funding companies and investors through VES and Capwill & Company (C&C), Capwill's accounting firm. CFL was used by Capwill to invest funds belonging to VES, the funding companies, and the investors.[4] In his capacity as accountant and escrow agent, Capwill had control of how funds were to be distributed from bank accounts belonging to several viatical funding companies, including Liberte and Alpha, as well as the accounts of VES and CFL. Capwill diverted funds, some of which were held in trust, to the various brokerage accounts, after which the funds were misspent, misappropriated, and placed in unsuitable investments. The complaints state the same claims in each case: negligence, negligent supervision, breach of fiduciary duty, fraud, conspiracy to defraud, RICO Act violations,

---

[4]Javitch avers that VES, CFL, and C&C are wholly owned subsidiaries of Capwill's holding company, CWN Group.

## C.  Equitable Estoppel

Defendants continue to argue with one voice that the receiver should be bound to arbitrate all claims against all defendants under the theory of equitable estoppel because all of the claims arise out of the broker-customer relationship that would not exist "but for" the customer agreements containing the arbitration clauses. As the district court correctly stated, nonsignatories may be bound to an arbitration agreement under ordinary contract and agency principles. *Arnold v. Arnold Corp.*, 920 F.2d 1269, 1281 (6th Cir. 1990). Five theories for binding nonsignatories to arbitration agreements have been recognized: (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter ego, and (5) estoppel. *Thomson-CSF v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995).

The court in *Thomson* held that a nonsignatory may be bound to an arbitration agreement under an estoppel theory when the nonsignatory seeks a *direct* benefit from the contract while disavowing the arbitration provision. *Id*. at 778-79. When only an indirect benefit is sought, however, it is only a signatory that may be estopped from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the underlying contract. *Id*. at 779. *See Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen*, 206 F.3d 411, 418 (4th Cir. 2000) (nonsignatory asserting breach of contract and breach of contract claims under the contract could not avoid the arbitration agreement in the contract).

The district court rejected the estoppel argument, stating that defendants' reasoning was "circular and without merit." It is not clear from the discussion of *Thomson*, however, whether the court found that Javitch, in asserting claims on behalf of VES and CFL, sought to benefit either directly or indirectly from the customer agreements that contained the arbitration clauses. Since this determination would be central to the question of whether to apply estoppel to bind Javitch,

follow the lead of these other circuits, this court commented that, if anything, *"Prima Paint* supports, rather than prohibits, excluding nonexistent contracts from the severability doctrine, because an allegation of a void contract raises exactly the same question as an allegation of a fraudulently induced arbitration agreement; whether the arbitrator has any power at all." *Id.* at 489.

Javitch does not argue that the arbitration agreements themselves were fraudulently induced, a claim that could be decided by the district court. Instead, he contends that the *accounts* were fraudulent because the money did not belong to the account holders, and that Capwill exceeded his authority as escrow agent when he diverted funds to the brokerage accounts with the defendants. This is not the same as asserting that Capwill was without authority, actual or apparent, to sign the customer agreements on behalf of VES and CFL. If the court determines on remand that Javitch's allegations challenge the validity of the arbitration agreements signed by Capwill on behalf of VES and CFL, that issue must be resolved before deciding the motions to compel arbitration. If valid agreements to arbitrate are found to exist, the court must also determine whether the various disputes fall within the scope of the arbitration agreements.

The complaint filed against Schwab did not allege that an account was opened on behalf of either VES or CFL. In fact, Schwab relies on a customer agreement signed by Capwill in his individual capacity. Since Javitch stands in the shoes of VES and CFL, not Capwill, there remains the question of whether VES and CFL could be bound by an agreement to arbitrate signed by Capwill in his individual capacity. This brings us to the final issue; whether the district court erred in concluding that Javitch could not be bound to the agreements under a theory of equitable estoppel.

---

basis to refuse to compel arbitration).

aiding and abetting violations of securities laws, conversion, and for money had and received.[5]

The claims of negligence and negligent supervision (counts 1 and 2) rest on duties defendants owed to Capwill, VES, CFL, and C&C to act as reasonable securities brokers would under similar circumstances. Javitch alleges that defendants breached those duties by failing to know their customers, recommending or permitting unsuitable investments, allowing the improper designation of accounts, and permitting inappropriate fund transfers. As with each count of each complaint, Javitch claims that as proximate cause of the defendants' wrongful conduct, Capwill, VES, CFL, C&C, and others (including funding companies and investors) suffered financial losses.

The fraud, conspiracy to defraud, and securities fraud claims (counts 4, 5, and 7) rest on allegations that the defendants knew or should have known the nature of the business that Capwill, VES, CFL, and C&C were involved in; that these entities had no significant earnings, capital, or assets of their own; that the funds they controlled were to be held in actual or constructive trust for others; and that Capwill had no meaningful experience in financial investing. Despite this knowledge, defendants opened brokerage accounts in the names of people or entities who had no right, title, or interest in the funds or securities in those accounts; accepted moneys into those accounts; allowed unsuitable investments of escrow funds; failed to restrain Capwill's improper withdrawals and transfers of funds from those accounts; issued statements with known misrepresentations of account ownership; and allowed

---

[5]Javitch appended two orders from the *Liberte* case to his brief on appeal, which were stricken by the court on defendants' motion. Shortly before oral argument, Javitch filed a motion asking that we take judicial notice of those orders for the "limited purpose of helping the court understand the background and context of the litigation." The motion is granted.

Capwill to withdraw and transfer funds after the accounts had been "restricted" by court order in April 1999.

Javitch claims that the defendants' wrongful activities in connection with these accounts constitute a pattern of racketeering activity; specifically, mail fraud, wire fraud, fraud in the conduct of financial transactions, and failure to prevent money laundering (count 6). Plaintiff further alleges that the various claims of negligence, fraud, and racketeering also involved breaches of fiduciary duties that defendants owed to Mr. Capwill, VES, CFL, and C&C (count 3). Lastly, plaintiff alleges that defendants are liable in conversion, or on a claim for money had and received, as a consequence of Capwill's diversion of funds rightfully belonging to viatical funding companies (such as Liberte and Alpha); the original investors; and/or VES, CFL, and C&C (counts 8 and 9).

Defendants promptly moved for an order compelling arbitration and for a stay of the proceedings, relying on customer agreements containing broad provisions for mandatory arbitration of disputes. Javitch alleges that Capwill and CFL caused multiple brokerage accounts to be opened in various names at all four brokerage firms.

At First Union, Capwill opened an account in the name of CFL and signed a client agreement containing the following mandatory arbitration clause:

> I agree that all claims or controversies, whether such claims or controversies arose prior to, on or subsequent to the date hereof, between me and EVEREN and/or any of its present or former officers, directors, or employees concerning or arising from (I) any account maintained by me with EVEREN individually or jointly with others in any capacity; (II) any transaction involving EVEREN or any predecessor firms by merger, acquisition or other business combination and me, whether or not such transaction occurred in such account or accounts; or (III) the construction, performance or breach of this or

court's duty to engage in a limited review to determine in the first place whether a valid arbitration agreement existed. *AT&T Techs.*, 473 U.S. at 649. However, even when there are allegations concerning the validity of an agreement to arbitrate that may be decided by the court, as opposed to the arbitrator, the motion to compel may not be finally resolved until the validity of the arbitration agreement has been decided. *See Burden*, 267 F.3d at 493; *C.B.S. Employees Fed. Credit Union v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 912 F.2d 1563, 1567-68 (6th Cir. 1990).

In *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 402-04 (1967), the Court found that an arbitration clause is "separable" from the rest of the contract and, as a result, "a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was induced by fraud." *Id.* at 402. Reading this holding generally, we stated in *C.B.S. Employees* that when the issues in dispute do not involve the making or the performance of the arbitration clause itself, the arbitration clause is to be enforced and the dispute submitted to arbitration. 912 F.2d at 1567-68.

As this court recently observed, several circuits have taken the view that *Prima Paint* does not require arbitration when it is alleged that no contract existed; that is, when the contract is claimed to have been void from its inception. *Burden*, 267 F.3d at 488 (collecting cases).[8] Without deciding whether to

---

[8] *See, e.g.*, *Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 590-91 (7th Cir. 2001) (determining whether signatory had power to bind company); *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 107 (3d Cir. 2000) (determining whether signatory had power to bind company); *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851, 855 (11th Cir. 1992) (whether signatory had power to bind another family member); *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1139 (9th Cir. 1991) (determining whether signatory had power to bind principals). *But see Snowden v. CheckPoint Check Cashing*, 290 F.3d 631 (4th Cir. 2002), *cert. denied*, 71 U.S.L.W. 3191, 3411, 3415 (U.S. Dec. 16, 2002) (No. 02-424) (illegality of check cashing loan agreement could not be

agreements to the same extent that the receivership entities would have been absent the appointment of the receiver.[7]

**B.   Enforceability of the Arbitration Agreements**

The district court distinguished *Hays* and released Javitch from the arbitration agreements on the grounds that the bankruptcy trustee in *Hays* had not challenged the validity of the arbitration provision contained in a customer agreement signed by an authorized representative of the debtor corporation. The district court explained that:

> Unlike the trustee in *Hays*, however, the Receiver herein challenges the validity of [the customer] agreement as "the named account holders were not the true account owners because they had no right to or title in any of the moneys or securities used to open the account." In contrast, the trustee in *Hays* did not assail the validity of the agreement.
>
> In this instance, it is alleged that Capwill, through [VES and/or] CFL, wrongfully diverted funds for placement in brokerage accounts with the Defendants herein. It is further alleged that the names on these accounts included Capwill and others. In sum, Capwill is alleged to have exceeded his authority and breached fiduciary duties relative to these funds. These allegations challenge the validity of the agreement at issue.

The district court's reasoning concerning the challenge to the validity of the customer agreements seems to relate to the

---

[7] At oral argument, counsel for defendants stated that they did not seek to arbitrate claims relating to accounts in the names of others because Javitch did not have standing to assert them. Because the question is not presented by these interlocutory appeals, we express no opinion concerning the receiver's standing to assert claims on behalf of any party other than VES and CFL, or whether such claims would be subject to arbitration.

---

any other agreement between us or any duty arising from the business of EVEREN or otherwise, shall be submitted to arbitration . . . .

Capwill was also alleged to have opened accounts at First Union in his own name and in the names of a girlfriend, a business associate, and an ex-employee.

At Morgan Stanley Dean Witter (MSDW), Capwill opened accounts in the names of VES, CFL, another girlfriend, a business associate, and the business associate's wife. The MSDW Client Account Agreement, signed by Capwill on behalf of CFL, included the following arbitration provision:

> You agree that all controversies between you or your principals or agents and Dean Witter Reynolds or its agents (including affiliated corporations) arising out of or concerning any of your accounts, orders or transactions, or the construction, performance, or breach of this or any other agreement between us, whether entered into before or after the date an account is opened, shall be determined by arbitration . . . .

At Maxus, Capwill opened accounts in the names of VES, Capwill, and other of Capwill's family members. Maxus relies on the following arbitration clause, which states in part that: "IT IS AGREED THAT ANY CONTROVERSY BETWEEN US ARISING OUT OF YOUR BUSINESS OR THIS AGREEMENT SHALL BE SUBMITTED TO ARBITRATION . . . ." Although Maxus maintains that this provision was part of agreements signed by Capwill on behalf of VES and himself, Javitch disputes whether this provision was in fact part of the agreements entered into when Capwill opened the accounts at Maxus.[6]

---

[6] Although we assume, as did the district court, that the arbitration clause was part of the Maxus account agreements, this issue remains open for determination on remand before Javitch may be compelled to arbitrate any claims against Maxus.

Finally, Capwill opened an account in his own name at Schwab and signed an account agreement agreeing to "settle by arbitration any controversy between myself and Schwab and/or any Schwab officers, directors, employees or agents relating to the Account Agreement, my brokerage account or account transactions, or in any way arising from my relationship with Schwab[.]"  Schwab accounts were also allegedly opened by Capwill in the names of Alpha Capital and Capwill's mother and sister.  This is the only defendant that is not alleged to have opened an account in the name of either CFL or VES.

The district court denied defendants' motions to compel arbitration, employing the same reasoning in each case.  After discussing the receiver's authority and the enforceability of the agreements to arbitrate, the district court found Javitch could not be bound by any of the arbitration clauses in the customer agreements because he "challenges the validity of such an agreement as 'the named account holders were not the true account owners because they had no right to or title in any of the moneys or securities used to open the account.'"  The district court also found estoppel could not be applied to bind Javitch to the arbitration agreements.  After defendants appealed, the district court stayed the proceedings pending appeal.

## II.

A written agreement to arbitrate disputes arising out of a transaction in interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  To enforce this dictate, the Federal Arbitration Act (FAA) provides for a stay of proceedings when an issue is referable to arbitration and for orders compelling arbitration when one party has failed or refused to comply with an arbitration agreement.  9 U.S.C. §§ 3 and 4.  The district court's decision whether to compel arbitration under the FAA is reviewed *de novo*.  *Burden v. Check Into Cash, LLC*, 267

the control of or on behalf of the debtor-taxpayer, he does not stand in the place of the owner of the assets over which he exercises his authority.

90 F.3d at 145-46.  The court found that the receiver succeeded to the rights of not only the debtor, but also the creditor.  In filing the wrongful levy action, the receiver "was exercising that power that the appointing court granted him; he was not exercising the rights of Derakhshan [the debtor], representing his interests, or acting in his place."  *Id.* at 146.  As we see it, *McGinness* does not stand for the proposition that a receiver never stands in the shoes of the entity in receivership, but suggests that the question depends on the authority granted by the appointing court and actually exercised by the receiver.  *See also Capitol Life Ins. Co. v. Gallagher*, No. 94-1040, 1995 WL 66602 (10th Cir. 1995) (unpublished decision), *aff'g* 839 F. Supp. 767, 769-70 (D. Colo. 1993) (state receiver was not bound by arbitration agreement because he appeared in his capacity as a class representative for plaintiff investors, and not as the receiver for GSL).

We are convinced, based on our assessment of both the claims being asserted by Javitch and the authority granted to him by the order appointing him as receiver, that the district court properly found that Javitch has asserted claims belonging to the receivership entities.  This court explained, albeit in another context, that although the stated objective of a receivership may be to preserve the estate for the benefit of creditors, that does not equate to a grant of authority to pursue claims belonging to the creditors.  *See Jarrett v. Kassel*, 972 F.2d 1415, 1426 (6th Cir. 1992) (customers could not rely on actions taken by corporate receiver, despite the receiver's authority to protect their interests in the receivership property).  Thus, we find that Javitch, who is bringing claims on behalf of VES and CFL, is bound to the arbitration

Thus, the district judge, who was also presiding over the *Liberte* case, rejected the contention that Javitch could escape the arbitration agreements on the grounds that he was bringing suit on behalf of the defrauded investors and funding companies.

On appeal, Javitch argues that this court repudiated the stand-in-the-shoes doctrine with respect to receivers in *McGinness v. United States*, 90 F.3d 143, 145 (6th Cir. 1996). The particular circumstances of the receiver's appointment in that case distinguishes it from the situation at hand. The state court appointed McGinness as a receiver to take possession of property belonging to the debtor for the purpose of satisfying a judgment entered against him in a divorce action. Third-party payors owing money to the judgment debtor were ordered by the court to remit payment directly to the receiver. When the IRS then levied funds due from the same payors to satisfy the debtor's tax obligation, McGinness brought suit against the IRS for wrongful levy.

The district court found McGinness could not bring suit against the IRS because he stood in the shoes of the taxpayer. This court reversed, explaining that:

> Ohio courts have described a receiver as "merely the administrative arm of the court who takes charge of the assets of the partnership for the purpose of conserving them to the ends of equity and *for the benefit of creditors* generally." *Tonti v. Tonti*, 118 N.E.2d 200, 242 (Ohio Ct. App. 1951) (emphasis added); *see Mine Safety Appliances Co. v. Best*, 76 N.E.2d 108, 110 (Ohio Ct. Common Pleas 1947) (stating that the receiver "stands as a ministerial officer of the court not having title to the property, but obtaining his authority by the act of the court alone"). The appointing court defines the powers of the receiver and, therefore, controls his actions. *See* OHIO REV. CODE § 2735.04 (stating that, under the control of the appointing court, the receiver may exercise certain powers). Because the receiver does not act under

F.3d 483, 487 (6th Cir. 2001), *cert. denied*, 122 S. Ct. 1436 (2002).

Manifesting a "liberal federal policy favoring arbitration agreements," the FAA "is at bottom a policy guaranteeing the enforcement of private contractual arrangements." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985). Before compelling an unwilling party to arbitrate, the court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement. *See AT&T Techs. v. Communications Workers of Am.*, 475 U.S. 643, 649 (1986). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). The district court found that none of the arbitration agreements were enforceable against the receiver and, therefore, did not reach the question of whether any of the claims asserted by Javitch were within the scope of those agreements.

## A.   Authority of Receiver

Javitch, who admittedly did not sign the agreements containing the provisions for mandatory arbitration of disputes, filed these actions in his capacity as the receiver for the entities VES and CFL. Defendants maintain that Javitch stands in the shoes of the receivership entities and is therefore bound to the arbitration agreements. While Javitch does not deny that Capwill signed the customer account agreements on behalf of VES, CFL, and/or himself, he claims to be bringing the instant lawsuits on behalf of the "true owners of the assets"; that is, the creditors who were defrauded by Capwill. As such, we must begin by addressing this contention.

The general rule is that a receiver acquires no greater rights in property than the debtor had and that, except as to liens in existence at the time of the appointment, the receiver holds the property for the benefit of general creditors under the direction of the court. *In re K-T Sandwich Shoppe of Akron*, 34 F.2d 962, 963 (6th Cir. 1929). Because they stand in the shoes of the entity in receivership, receivers have been found to lack standing to bring suit unless the receivership entity could have brought the same action. *See, e.g., Goodman v. FCC*, 182 F.3d 987, 991-92 (D.C. Cir. 1999) (receiver did not have standing to sue on behalf of customers and creditors of entity in receivership); *Scholes v. Lehmann*, 56 F.3d 750, 753-55 (7th Cir. 1995) (receiver for corporation could sue for diversion of assets as fraudulent conveyances by controlling shareholder).

Applying this general rule, the court in *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153-54 (3d Cir. 1989), concluded that arbitration agreements, like other prepetition contractual commitments, were binding on the bankruptcy trustee to the same extent that they would bind the debtor. As a result, the court held that

> in actions brought by the trustee as successor to the debtor's interest under section 541, the "trustee stands in the shoes of the debtor and can only assert those causes of action possessed by the debtor. [Conversely,] [t]he trustee is, of course, subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor." *Collier on Bankruptcy*, ¶ 323.02[4].

*Id.* at 1154 (footnotes omitted and alteration in original). Consistent with this rationale, the court also concluded that the trustee could not be compelled to arbitrate creditor claims that it was authorized to assert under 11 U.S.C. § 544(b). *Id.* at 1155. Javitch argues that *Hays* supports the district court's refusal to compel arbitration because his complaints attempt

to assert claims on behalf of the defrauded investors. The district court, however, did not distinguish *Hays* on that basis.

The district court's opinions suggest that the receiver could not bring these actions on behalf of the investors. The court explained that it was

> mindful of a receiver's proper role in litigation such as in this case *sub judice*:
>
>> Fraud on *investors* that damages those *investors* is for those *investors* to pursue–not the receiver. By contrast, fraud on the *receivership entity* that operates to *its* damage is for the *receiver* to pursue (and to the extent that investors as the holders of equity interests in the entity may ultimately benefit from such pursuit, that does not alter the proposition that the receiver is the proper party to enforce the claim).

*Scholes v. Schroeder*, 744 F. Supp. 1419, 1422-23 (N.D. Ill. 1990) (emphasis in original). The Complaint clearly contends that the funds used to open accounts with the Defendants "were wrongfully, negligently, intentionally, fraudulently or recklessly diverted from accounts of CFL" in violation of Capwill's, CFL's and VES's standard of care, their fiduciary duties, among others. Compl. at ¶ 21.

In accordance with the Order of Appointment in the *Liberte* case, the Plaintiff Receiver has been duly authorized by the Court to "oversee and to administer the business and assets of VES and CFL" by various means, including the institution of litigation to preserve the Receivership property. The issue for resolution in the case at bar is whether the Receiver for VES and CFL is bound by the agreement to arbitrate alleged to have been signed by Capwill.