Marc WERNER, M.D., individually and on behalf of all others similarly situated, Plaintiff,

v.

MILLER TECHNOLOGY MANAGE-MENT, L.P., MTM I, LLC, Miller Capital Management, Inc., David R. Parker, Edmund R. Miller, David N. Dungan, Allan R. Frank, Ulysses S. Knotts, III, Ted A. Fernandez, and Bruce V. Rauner, Defendants,

Interprise Technology Partners, L.P., Nominal Defendant.

C.A. No. 19721.

Court of Chancery of Delaware, New Castle County.

Submitted: Jan. 14, 2003.
Decided: Feb. 13, 2003.

Norman M. Monhait, Rosenthal Monhait Gross & Goddess, P.A., Wilmington, DE; Joel Bernstein, Peter Rachman, Goodkind Labaton Rudoff & Sucharow, L.L.P., New York City and Ft. Lauderdale, FL, for Plaintiff.

Arthur L. Dent, Richard L. Renck, Potter Anderson & Corroon, L.L.P., Wilmington, DE; Todd R. Legon, Michael G. Shannon, Wallace Bauman Legon Fodiman Ponce & Shannon, P.A., Miami, FL, for Defendants.

## *OPINION*

LAMB, Vice Chancellor.

### I.

This action arises out of a series of purportedly self-interested transactions between a Delaware limited liability partnership, its portfolio companies, general partner and the principals thereof, and certain limited partners. The partnership agreement and certain related documents provided that the partnership would be managed by the general partner, who, in turn, would be assisted by an advisory board. Plaintiff contributed $250,000 in capital in return for a proportionate interest in the partnership. Some members of the advisory board exchanged shares of stock in a privately held corporation for an interest in the partnership.

The Delaware partnership began operations in 1999, acquiring interests in a number of other companies. Several of those portfolio entities later entered into contracts with a publicly traded corporation for the provision of consulting services, spending a total of approximately $17.5 million on the various arrangements with that consulting company. Throughout the relevant time period, the non-managing principal of the general partner and all advisory board members were both officers and directors of that consulting company. Also during that time, the managing principal of the general partner was chairman of one of the portfolio companies.

Several of the partnership's portfolio companies filed for bankruptcy protection, rendering the partnership's investments in them virtually worthless. The plaintiff thereafter filed suit alleging various derivative individual and class claims on behalf of the partnership, himself, and other similarly situated limited partners.

The plaintiff's complaint contains two core allegations. First, that the general partner and its principals acted in concert with the advisory board members and caused the partnership to invest in, and make financing commitments to, companies in which they had personal stakes. This allegation includes the assertion that the shares exchanged by the advisory board partners for their partnership interest were improperly and unfairly valued. Second, the plaintiff alleges that the general partner, its principals, and the advisory board members engaged in a scheme to direct the partnership's portfolio companies to enter into lucrative consulting agreements with the consulting company controlled by them, thereby enriching themselves at the expense of the other limited partners.

The plaintiff's complaint must be dismissed with regard to the advisory board members because they are not subject to the reach of Delaware's long-arm statute and lack sufficient minimum contacts with the State of Delaware. Therefore, this court cannot properly exercise personal jurisdiction over them. However, the plaintiff has stated a claim upon which relief can be granted with regard to the general partner and its managing principal. The defendants' contentions that this claim is barred as a matter of law by the partnership agreement are not persuasive. Therefore, the defendants' motion to dismiss for failure to state a claim upon which relief can be granted will be denied.

## II.

### A. The Parties

#### 1. The Plaintiff[1]

Plaintiff Marc Werner is a New York resident and a limited partner in Interprise Technology Partners, L.P.[2] Interprise was formed by an Agreement of Limited Partnership on January 27, 1999, as later amended (the "Partnership Agreement"). In early 1999, Werner purchased limited partnership units in Interprise pursuant to a Private Placement of Limited Partnership Interests ("PPM").

#### 2. The Defendants
##### a. Interprise

Nominal defendant Interprise is a Delaware limited partnership created for the

---

1. For purposes of this motion, the following facts are taken from the well-pleaded allegations in the complaint.

2. Werner brings this action both derivatively and on behalf of the nominal defendant Inter-

prise, and as a putative class action on behalf of present and former limited partners of Interprise, excluding the defendants. To date, however, no party has moved to certify the class.

purpose of making private equity investments. Interprise was formed in January 1999, and has its place of business is Miami, Florida.

Interprise's business plan designates that partnership capital is to be used to invest chiefly in private equity securities of companies in the information technology industry. The Partnership Agreement provides that Interprise's business affairs are to be managed by the general partner, which may, under the Partnership Agreement, rely on advice from an advisory board.

### b. *Interprise's General Partner And Affiliated Parties*

The general partner of Interprise is defendant Miller Technology Management, L.P. ("MTM LP"). MTM LP is a limited partnership organized under the laws of Delaware. It maintains its business offices at the same address as Interprise.

Defendant MTM I LLC ("MTM I") is the general partner of MTM LP. MTM I is a Delaware limited liability company with the same business address as Interprise in Miami, Florida. Defendants Miller and Parker each own a 50% interest in MTM I.

Defendant Miller Capital Management, Inc. ("MCM") is a Delaware corporation with its offices located at the same address as Interprise. MCM provides certain administrative services to Interprise, and is wholly owned by defendant Miller.[3]

Defendant Miller (along with defendant Parker) formed Interprise. Additionally, Miller is a principal of Interprise's general partner (MTM LP), founder and President of MCM, and Chairman of the Board of eSavio, Inc., formerly known as Netera, Inc. He was also a founder of Answerthink, Inc., formerly known as Answerthink Consulting Group, Inc., and a director of Answerthink until March 2001.[4] As of March 15, 2000, Miler owned 520,329 shares of Answerthink, and disclaimed beneficial ownership of an additional 1,28 million shares through The George E. Miller Trustee of the Edward R. Miller Flint Trust.[5]

Defendant Parker is a founder of Interprise, and a managing principal of its general partner (MTM LP). He was also, at all times relevant to this litigation, a director of eSavio.

### c. *The Advisory Board Defendants*

The Partnership Agreement requires that Interprise maintain an advisory board comprised of limited partners that may advise the general partner on investment activities and other matters (the "Advisory Board"). At all times relevant to this litigation, the Advisory Board members were defendants David N. Dungan, Allan R. Frank, Ulysses S. Knotts, III, Ted A. Fernandez, and Bruce V. Rauner (collectively, the "Advisory Board Defendants"). None of the Advisory Board Defendants are residents of the State of Delaware.[6]

3. Counsel for the defendants noted at oral argument that MCM had filed for bankruptcy.

4. Answerthink is a Florida corporation with its executive offices located in the same suite of offices as Interprise. The company's principal business is consulting services. The individual defendants Miller and Parker, together with the members of the Advisory Board, either directly or beneficially owned 24% or more of Answerthink's outstanding shares as of March 15, 2000.

5. Counsel for the defendants noted at oral argument that Miller had filed for bankruptcy.

6. Neither the complaint nor the answering brief submitted by Werner addresses the residence of any of the Advisory Board Defendants. However, each of defendants Dungan, Fernandez, Frank, Knotts, and Rauner has submitted an affidavit stating that he is not a resident of the State of Delaware. Therefore, for purposes of this motion, the Advisory

Defendant Dungan was a founder of Answerthink and currently serves as a director and its Chief Operating Officer. In his capacities as a director and an officer of Answerthink, Dungan received compensation of $550,000 for the year 1999, and $500,000 for the year 2000. Dungan owned 1.243 million shares of Answerthink as of March 15, 2000.

Defendant Frank was also a founder of Answerthink and currently serves both as President and as a director of the company. Before becoming President of Answerthink, Frank served as Answerthink's Executive Vice President and Chief Technology Officer. In his capacities as a director and an officer of Answerthink, Frank received remuneration of $550,000 and $500,000 for the years 1999 and 2000, respectively. As of March 15, 2000, Frank owned 1.466 million shares of Answerthink.

Defendant Fernandez was a founder of Answerthink as well and has served as both a director and Chief Executive Officer since the company's inception. As a director and CEO of Answerthink, Fernandez received compensation of $550,000 in 1999 and $500,000 in 2000. He also owns 100,000 shares of Answerthink, not including the 1.366 million shares held through the Aurelio E. Fernandez Trustee of the Ted A. Fernandez Flint Trust.

Defendant Knotts was another co-founder of Answerthink and served first as its Executive Vice President of Sales and Marketing and then as Chief Sales and Marketing Officer. He is also a director of the company. For his services to Answerthink, Knotts received remuneration of $510,000 for the year 1999 and $500,000 for the year 2000. As of March 15, 2000,

Knotts owned 1.466 million shares of Answerthink.

Defendant Rauner was a director of Answerthink from its inception until May 9, 2001. In his capacity as a non-officer/non-employee director, Rauner received an option to purchase 15,000 shares of Answerthink common stock, exercisable at the fair market value of the common stock on the date of the grant. Rauner also owned a proportionate amount of 4.190 million shares of Answerthink through his interest in Golder Thoma, Cressey, Rauner Fund V., L.P. ("GTCR V"), of which he is a principal.

### B. *Capital Contributions To Interprise*

Interprise sold limited partnership units to the investing public during early 1999, intending to raise approximately $85 million. The general partner and Advisory Board members contributed $25 million of capital to Interprise. Some of these capital contributions were in the form of in-kind stock contributions of privately held corporations.

Under a purchase agreement dated September 18, 1998, MCM bought 16 million shares of Netera, now known as eSavio, for $1.6 million. Under the terms of that agreement, MCM committed to provide a total of $46.9 million in financing to Netera. During 1999, Interprise acquired a stake in Netera from MCM. MCM (or Miller) also assigned a portion of its equity interest and financing commitment to Interprise. There were no procedural safeguards employed in these transactions.

In March of 1999, Netera acquired Net-Sol International, Inc. for $1.9 million. GTCR V (of which Rauner is a principal) owned 33.33% of NetSol. Fernandez,

Board Defendants' status as nonresident defendants will be considered a fact. *See* Def.

Op. Br. Ex. C–G at 3.

Frank, Knotts, and Miller owned 12.59%, 5.03%, 5.03%, and 2.52% of NetSol common stock, respectively. Under the terms of the acquisition, Fernandez, Frank, and Knotts received shares in Netera and committed to make future contributions to Netera. Miller received cash.

Later that same year, Fernandez, Frank and Knotts assigned their Netera stock, as well as the financing commitments associated therewith, to Interprise. In return, they each received Interprise units. Again, no procedural safeguards were employed.

## C. Other Transactions Involving Interprise And Defendants' Affiliates

Overall, Interprise has invested over $45 million in entities affiliated with the defendants. The relationships between the defendants and these companies were not disclosed to the limited partners of Interprise.

### 1. World Commerce Online

Defendant Parker has been Chairman of World Commerce Online, Inc. ("WCO") since March 2001 pursuant to a stock purchase agreement between Interprise and WCO originating in February 1999. WCO is or was a Delaware corporation with its principal place of business in Orlando, Florida. Its primary business purpose is or was to provide e-commerce business solutions targeting global perishable products industries.

As of June 30, 2001, Interprise either directly or beneficially owned approximately 62% of WCO's outstanding shares. WCO entered into several loan agreements with Interprise, that, as of June 30, 2001, totaled $11.8 million. There is no evidence that any procedural safeguards were put in place for these loan transactions. On August 20, 2001, WCO filed for protection under the federal bankruptcy laws.

### 2. Consulting Arrangements With Answerthink

Throughout the period relevant to the litigation, Miller, Dungan, Frank, Knotts, Fernandez, and Rauner were members of Answerthink's eleven-member board of directors. During that time, Answerthink received over $17.5 million in revenue from Interprise portfolio companies. The portfolio companies that had consulting arrangements with Answerthink included Netera, WCO, Parts Locators International ("International Parts"), and VisualPlex.[7]

As of December 2000, Answerthink's accounts receivable from eSavio for consulting services totaled $727,000. In August 2000, Answerthink sold eSavio a license for its "proprietary knowledge management system" for $1.5 million.[8] WCO paid Answerthink $1.746 million and $5.934 million to perform various consulting services in 1999 and 2000 respectively. Additionally, Answerthink accounts receivable from WCO totaled $4.737 million as of December 2000. During the year 2000, International Parts paid Answerthink $847,000 and delivered a promissory note for an additional $500,000, plus $750,000 in convertible preferred stock in exchange for consulting services. Also in 2000, VisualPlex paid Answerthink $1.948 million for

---

**7.** International Parts is or was a Florida corporation with its headquarters in Jacksonville, Florida. As of June 30, 2001, Interprise had invested approximately $4.1 million in exchange for a 22% stake in International Parts. VisualPlex is or was a Delaware corporation headquartered in Pittsford, New York. As of June 30, 2001, Interprise had invested approximately $15.854 million in VisualPlex in exchange for 68% of VisualPlex stock. Both International Parts and VisualPlex have filed for protection under federal bankruptcy laws.

**8.** Compl. ¶ 52.

consulting services, and as of December 29, 2000 Answerthink's accounts receivable from VisualPlex for consulting services totaled $787,000.

## III.

Werner filed his complaint against the defendants on July 1, 2002. The complaint makes claims of self-dealing against the defendants who purportedly were acting in concert. Werner contends that the defendants used their positions of control and influence over Interprise to cause Interprise to engage in transactions that, while detrimental to that partnership, benefited the individual defendants.

The main focus of Werner's complaint centers on the allegedly "unfair and self-dealing 'consulting' agreements between the affiliated companies and Answerthink."[9] More precisely, the complaint alleges that "the defendants caused [Interprise] to invest approximately $45 million or more of [its] capital in defendant-affiliated companies and in turn caused those affiliated companies to enter into unfair and self-dealing 'consulting' agreements with Answerthink" which was also controlled by the defendants.[10]

Count I of the complaint alleges a breach of fiduciary duties by the general partner, MTM I, Miller, and Parker. Specifically, the complaint alleges breaches of the duty of care and the duty of disclosure against MTM, MTM I, Miller, and Parker as general partners of Interprise. Count II of the complaint seeks judicial dissolution of Interprise and appointment of a receiver or liquidating trustee for the winding up of Interprise's affairs. Count III of the complaint requests an accounting of Interprise's operations.

Count IV alleges aiding and abetting a breach of fiduciary duty and conspiracy against all defendants. More precisely, Count IV alleges that all defendants used Interprise to make investments for their own benefit by engaging in unfair and self-dealing transactions. Additionally, Count IV alleges that the defendants joined in a combination of two or more persons for the unlawful purpose of conspiring to injure Interprise and the putative class through their concealment of information and their unfair and self-dealing transactions.

## IV.

### A. Personal Jurisdiction Standard Of Review

■ When personal jurisdiction is challenged by a motion to dismiss pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the nonresident defendant.[11] Generally, the court will engage in a two-step analysis; first determining whether service of process on the nonresident is authorized by statute; and, second, considering whether the exercise of jurisdiction is, in the circumstances presented, consistent with due process.[12]

### B. Rule 12(b)(6) Standard Of Review

■ When considering a motion to dismiss a complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted, the court is to assume the truthfulness of

---

9. Compl. ¶ 4.

10. Compl. ¶ 3.

11. See *Plummer & Co. Realtors v. Crisafi*, 533 A.2d 1242, 1244 (Del.Super.1987); *see also Finkbiner v. Mullins*, 532 A.2d 609, 617 (Del.Super.1987) (on a Rule 12(b)(2) motion, "[t]he burden is on the plaintiff to make a specific showing that this Court has jurisdiction under a long-arm statute") (citing *Greenly v. Davis*, 486 A.2d 669 (Del.1984)).

12. *LaNuova D & B, S.p.A. v. Bowe Co.*, 513 A.2d 764, 768–69 (Del.1986).

all well-pleaded allegations of fact in the complaint.[13] Although "all facts of the pleadings and reasonable inferences to be drawn therefrom are accepted as true ... neither inferences nor conclusions of fact unsupported by allegations of specific facts ... are accepted as true."[14] That is, "[a] trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in Plaintiffs' favor unless they are reasonable inferences."[15] Additionally, the court may consider, for certain limited purposes, the content of documents that are integral to or are incorporated by reference into the complaint.[16] Under Rule 12(b)(6), a complaint may, despite allegations to the contrary, be dismissed where the unambiguous language of documents upon which the claims are based contradict the complaint's allegations.[17]

## V.

A. *Delaware's Long–Arm Statute And Due Process Requirements Do Not Permit This Court To Exercise Jurisdiction Over The Advisory Board Defendants*

Before reaching the merits of their motion to dismiss under Court of Chancery Rule 12(b)(6), the court must first consider the defendants' motion to dismiss for lack of personal jurisdiction pursuant to Court of Chancery Rule 12(b)(2).[18] Because, none of the Advisory Board Defendants are residents of the State of Delaware,[19] a two-step analysis is required to determine whether personal jurisdiction may be exercised over them.[20] First, the court must consider whether Delaware's long-arm statute for service of process on nonresident defendants is applicable.[21] Second, the court must determine whether subjecting nonresident defendants to jurisdiction in Delaware violates the Due Process Clause of the Fourteenth Amendment.[22]

1. *Delaware's Long–Arm Statute Does Not Provide A Basis For Asserting Personal Jurisdiction Over The Advisory Board Defendants*

■ Werner alleges that this court has personal jurisdiction over the Advisory Board Defendants based on an application of § 3104(c)(1) of Delaware's long-arm statute.[23] He claims that the members of the Advisory Board transacted business in the State of Delaware because "[t]he Advi-

---

**13.** *Grobow v. Perot,* 539 A.2d 180, 187 & n. 6 (Del.1988).

**14.** *Id.*

**15.** *Id.*

**16.** *See In re Santa Fe Pac. Corp. S'holders Litig.,* 669 A.2d 59, 69–70 (Del.1995).

**17.** *See In re Wheelabrator Tech's, Inc. S'holders Litig.,* 1992 WL 212595, at *3 (Del.Ch. Sept.1, 1992) ("the Court is hardly bound to accept as true a demonstrable mischaracterization and the erroneous allegations that flow from it"); *See also Malpiede v. Townson,* 780 A.2d 1075, 1083 (Del.2001) ("a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint

effectively negate the claim as a matter of law").

**18.** *See Branson v. Exide Elecs. Corp.,* 625 A.2d 267, 268–69 (Del.1993).

**19.** *See supra* note 6.

**20.** *LaNuova D & B, S.p.A.,* 513 A.2d at 768–69.

**21.** *Id.*

**22.** *Id.*

**23.** The relevant portion of Delaware's general long-arm statute, 10 *Del. C.* § 3104(c), provides as follows:

As to a cause of action brought by a person arising from any of the acts enumerated in this section, a court may exercise personal

sory Board was created to participate in the management of the Partnership." [24] Werner reasons that by actively participating in the management of Interprise (a Delaware limited partnership) the Advisory Board Defendants have transacted business in Delaware, and subjected themselves of the state's long-arm statute. In his answering brief, Werner points to various sections of both the Partnership Agreement and the PPM to show that the Advisory Board was designated as a critical part of the management team.

Werner's argument is based on conclusory statements and unreasonable inferences, and must fail. The duties of the Advisory Board as prescribed by the Partnership Agreement and the PPM are not managerial in nature. On the contrary, that Agreement provides that the Advisory Board members are limited partners in Interprise and as such can "take no part in the control, management, direction or operation of the affairs of [Interprise]." [25] Indeed, even the sections of the Partnership Agreement and the PPM upon which Werner relies indicate that the Advisory Board's role is to advise and assist the general partner as needed, not to manage the partnership. Nothing that Werner refers to shows that the Advisory Board managed Interprise.

For example, as Werner noted, the Partnership Agreement states that "[t]he Advisory Board is also expected to *advise* the General Partner on, and to *assist* the Partnership's Portfolio Companies with, a vari-

ety of other matters." [26] The PPM provides that "[t]he Principals will be *assisted* ... by an experienced Advisory Board," [27] "[t]he Advisory Board members will bring their industry and investment expertise to bear to *assist* the Principals." [28]

The Advisory Board's role in Interprise's management structure is to offer opinions regarding decisions that the general partner, as manager, will ultimately make. Nowhere in the Partnership Agreement or the PPM is there language that gives the Advisory Board the power to direct the actions of the general partner. The ability to offer ideas cannot be construed as an ability to manage the affairs of Interprise. The suggestion that the Advisory Board participates in management simply because it contributes information to the decision-making process is untenable.

Additionally, Werner has failed to allege any facts that show that the Advisory Board Defendants actually exerted any control over Interprise. The complaint contains only conclusory statements that "the defendants used their positions of control and influence" to cause Interprise to act. [29] Rather than substantiate these statements (either in his answering brief or at oral argument) Werner points to *RJ Associates, Inc. v. Health Payors' Organization Ltd. Partnership* [30] in support of his contention that the Advisory Board Defendants are, in fact, subject to personal juris-

jurisdiction over any nonresident, or his personal representative, who in person or through an agent: * * * (1) Transacts any business or performs any character of work or service in this state . . . .

24. Pl. Ans. Br. at 33.

25. Def. Op. Br. Ex. A ("P'ship Agreement") ¶ 6.1.

26. P'ship Agreement, ¶ 7.1 (emphasis added).

27. Def. Op. Br. Ex. B ("PPM") at 14 (emphasis added).

28. *Id.* (emphasis added).

29. Compl. ¶ 80.

30. 1999 WL 550350 (Del.Ch. Jul.16, 1999).

diction under 10 *Del. C.* § 3104(c)(1).[31] In *RJ Associates*, however, a series of actions were specifically alleged that showed the limited partner transacted business in Delaware.[32] First, it was alleged that the limited partner in that case, participated in the formation of the partnership.[33] Second, plaintiff alleged that the limited partner appointed the majority of the members of the general partner corporation's board of directors thereby exerting control over the general partner.[34] Third, it was alleged that the limited partner unilaterally acted to alter the partnership agreement affecting the partnership distributions.[35]

Here, unlike in *RJ Associates*, there is no allegation that any actions were undertaken by the Advisory Board in Delaware, nor is there any suggestion of exactly how the Advisory Board exerted control over Interprise. Werner claims only that the Advisory Board participated in the formation of the Partnership. There are no allegations or references to any meetings of the Advisory Board or actions it had taken, in an advisory capacity or otherwise, anywhere in the complaint.[36]

▮ Furthermore, Werner has failed to offer any affirmative proof of the jurisdictional claims he advanced in his complaint. Once a defendant challenges the plaintiff's allegation of personal jurisdiction, as happened here, the burden is on the plaintiff to offer affirmative proof of the allegation.[37] Werner simply has not done so. Instead, he advances only the references to the Partnership Agreement and the PPM discussed above.

▮ Werner also argues that the Advisory Board Defendants are subject to personal jurisdiction under the conspiracy theory of jurisdiction because "[b]y their conduct, each of the defendants aided and abetted the breaches of fiduciary duty committed by the General Partner ... and engaged in a conspiracy to breach such fiduciary duties."[38] "The specific factual allegations in a complaint that proposes to invoke the 'conspiracy theory' must be more than a 'facile way for [plaintiffs] to circumvent the minimum contacts requirement.' "[39] To validly exercise jurisdiction under a conspiracy theory a court must find that a five-part test has been satisfied.[40] The test requires: (1) the existence

---

31. Pl. Ans. Br. at 37.

32. *RJ Associates*, 1999 WL 550350, at *5.

33. *Id.* at *5–*6.

34. *Id.*

35. *Id.*

36. At oral argument, the plaintiff's attorney was given ample opportunity to address the absence of any allegation that the Advisory Board Defendants undertook any activity in Delaware. Specifically, the court asked the plaintiff's attorney if any evidence was uncovered during the books and records inquiry that showed a connection between the State of Delaware and the Advisory Board Defendants (*e.g.*, meeting minutes, expense receipts, ledgers, etc.). The plaintiff's attorney offered no such evidence. The court also noted that the plaintiff's attorney had chosen not to en-

gage in discovery on the question of personal jurisdiction. In response, the plaintiff's attorney simply suggested that, based on his reading of *RJ Associates*, the applicable standard is a *prima facie* burden of proof, which the plaintiff had met.

37. *Newspan, Inc. v. Hearthstone Funding Corp.*, 1994 WL 198721, at *3 (Del.Ch. May 10, 1994).

38. Compl. ¶ 80.

39. *Crescent/Mach I Partners, L.P. v. Turner*, 2000 WL 1481002, at *8 (Del.Ch. Sept.29, 2000)(quoting *Computer People, Inc. v. Best Int'l Group, Inc.*, 1999 WL 288119, at *6 (Del.Ch. Apr.27, 1999)).

40. *See Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 225 (Del.1982).

of a conspiracy to defraud; (2) the defendant must be a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occur in Delaware; (4) the defendant know or have reason to know of the act in Delaware or that acts outside Delaware would have an effect in Delaware; and (5) the act in or effect on Delaware is a direct and foreseeable result of the conduct in furtherance of the conspiracy.[41] Importantly, this test is a strict test that should be construed narrowly.[42] Therefore, application of personal jurisdiction under the conspiracy theory requires factual proof of each enumerated element.[43] While Werner does allege that a conspiracy existed, and that the Advisory Board Defendants were parties to that conspiracy, he offers no factual allegation that a substantial act or effect of the conspiracy occurred in Delaware. Without some showing that some act or effect occurred in Delaware, Werner cannot satisfy the third element of the conspiracy theory test, and his claim for personal jurisdiction on this ground must also fail.

## 2. The Exercise Of Personal Jurisdiction Over The Advisory Board Defendants Would Violate The Due Process Clause Of The United States Constitution

■ Even if Werner's Complaint could satisfy the requirements of Delaware's long-arm statute, the Advisory Board Defendants do not have the requisite contacts with Delaware to allow this court to exercise personal jurisdiction consistent with due process. Due process in the exercise of personal jurisdiction requires a "minimum contacts" analysis, which seeks to determine the fairness of subjecting a nonresident defendant to suit in a distant forum by considering all of the connections among the defendant, the forum and the litigation.[44] The "minimum contacts" test protects a defendant against the burdens of litigating in a distant or inconvenient forum, and ensures that " 'the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.' "[45] A defendant's conduct and connection with the forum state should be such that he can reasonably anticipate being haled into court in the nonresident forum.[46]

The Advisory Board Defendants simply do not have enough contacts with Dela-

---

41. See id.

42. See Computer People, 1999 WL 288119, at *5.

43. See Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc., 1995 WL 694397, at *12 (Del.Ch. Nov.21, 1995).

44. See Int'l Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); Shaffer v. Heitner, 433 U.S. 186, 212, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); see also Sternberg v. O'Neil, 550 A.2d 1105, 1116 (Del.1988).

45. Newspan, Inc., 1994 WL 198721, at *5 (quoting World–Wide Volkswagen Corp. v.

Woodson, 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

46. Id. A basic tenet of the due process analysis of a court's exercise of personal jurisdiction is whether the party "purposely availed" itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (This "purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.' " (citations omitted)).

ware to subject them to jurisdiction in this court. They do not reside in Delaware, they do not conduct business in Delaware, and they own no real property in Delaware. The defendants did not attend any Advisory Board meetings in Delaware. They never contracted to supply goods or services on behalf of Interprise in the State of Delaware. Additionally, the Advisory Board Defendants have done no act in Delaware or any act outside of Delaware that has caused injury in this state.[47]

Aside from the fact that the Advisory Board Defendants are limited partners in a Delaware limited partnership, none has any contacts with the State of Delaware whatsoever. The only connections to Delaware that Werner alleges with respect to the Advisory Board Defendants is that they exerted control over Interprise by participating in management. As previously discussed, that conclusion cannot reasonably be drawn from the complaint.

Werner also points to the existence of a choice of law provision in support of his claim that the Advisory Board Defendants have minimum contacts with the State of Delaware. He relies on *Burger King Corp. v. Rudzewicz*[48] to argue that the choice of law provision in the Partnership Agreement shows that the Advisory Board Defendants had deliberately affiliated themselves with the State of Delaware and are therefore subject to personal jurisdiction. Werner's reliance on *Burger King* is somewhat misplaced. The court recog-

nized in *Burger King* that, while a choice of law provision should not be ignored in a jurisdictional analysis, such a provision does not by itself confer jurisdiction.[49] Because, in this case, the provision is essentially standing alone, it cannot be said to bestow personal jurisdiction on the defendants. The partners could have, if they had chosen, availed themselves of Delaware law through a forum selection clause in the Partnership Agreement, but they did not.

Therefore, the court will dismiss Werner's complaint against the Advisory Board Defendants for lack of personal jurisdiction.

B. *Werner's Claim For Breach Of Fiduciary Duty of Loyalty Against The General Partner (MTM LP), MTM I, and Parker Is Not Barred By The Partnership Agreement Or The PPM*[50]

The defendants have moved to dismiss Werner's claims pursuant to Court of Chancery Rule 12(b)(6) essentially for two reasons. First, they argue that Werner's claims for breach of fiduciary duty are time barred by a limitations provision in the Partnership Agreement. Second, they contend that the duty of loyalty claim is precluded by disclosures of potential conflicts of interest included in the PPM. For the reasons stated below, the court will deny the motion to dismiss with respect to both of these claims.[51]

47. *See supra* note 36.

48. 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528.

49. 471 U.S. at 482, 105 S.Ct. 2174.

50. At oral argument, the parties noted that defendants Miller and MCM had filed for bankruptcy in federal court. In light of this development, and out of respect for the auto-

matic stay provisions in the federal bankruptcy code, this opinion does not adjudicate any issues relating to either bankrupt party.

51. The defendants also argue that Werner has failed to allege facts sufficient to state a claim for breach of the duty of care, and that claim should therefore be dismissed. Count I of the complaint states only that the defendants, in various capacities, failed to act with reasonable care. In other words, Werner has at-

1. *The Limitations Provision In The Partnership Agreement Does Not Preclude Werner's Claim*

■■ The defendants state that Werner's claims "fail as a matter of law as they are time barred by the applicable limitations period."[52] The defendants refer to Section 12.4 of the Partnership Agreement in support of this claim. Section 12.4 is entitled "Governing Law; Severability; Limitations," and reads in pertinent part:

> An action may not be commenced by any Limited Partner *under this Agreement* unless brought within six months after the actions or circumstances giving rise to such cause of action have occurred.[53]

(Emphasis added). The defendants contend that Section 12.4 applies to any claims relative to Interprise that may be brought by any limited partner, including fiduciary duty claims. In support of this contention, they argue that the underlined phrase "under this Agreement" is best read as modifying its immediate antecedent, i.e., the term "Limited Partner."[54] Accordingly, the defendants reason, the six-month limitations period precludes any claim that might be brought by Werner (who is a "Limited Partner under this Agreement"), including one for breach of fiduciary duty.

In contrast, Werner argues that the phrase "under this Agreement" is best understood to modify the word "action." Based on this reading of Section 12.4, he argues that the six-month limitations period in Section 12.4 applies to only contract actions that may be brought by limited partners arising under the Partnership Agreement. Because the claims in the instant action stem from alleged breaches of fiduciary duties, and are not based in contract, the argument goes, the limitations provision does not apply.[55] For the various reasons discussed below, the court finds that the six-month limitations period does not apply to fiduciary duty claims.

First, the term "Limited Partner" is itself defined in the Partnership Agreement and means a limited partner under that agreement. Therefore, to read the phrase "under this Agreement" as modifying "Limited Partner" would obviously render the phrase meaningless surplusage. To avoid this result, the court reads that phrase as modifying or limiting the subject of the sentence, that is "[a]n action." So construed, it is clear that the six-month limitation period applies only to actions arising under the Partnership Agreement and not to actions for breach of fiduciary duty.

Second, this result is consistent with and suggested by the fact that the limitations period is found in a section of the Partnership Agreement entitled "Governing Law, Severability, Limitations." All the other provisions of this section are plainly related to the interpretation and enforcement

---

tempted to state a claim for duty of care by alleging simple negligence. To state a claim for a breach of the duty of care, the plaintiff must allege more than simple negligence. *In re Limited, Inc.*, 2002 WL 537692 at *10 (Del. Ch. Mar.27, 2002). In this case, even more may be necessary once the liability limitation provisions of Section 5.6 of the Partnership Agreement are considered. When questioned about this deficiency in the complaint at oral argument, the plaintiff's counsel responded that breach of the duty of loyalty was the thrust of the complaint, and conceded that the allegations of simple negligence in the complaint were inadequate to state a claim for breach of the duty of care. Therefore any purported claims for breach of the fiduciary duty of care will be dismissed.

**52.** Def. Op. Br. at 9.

**53.** P'ship Agreement ¶ 12.4.

**54.** Def. Opening Br. at 9.

**55.** *See* Pl. Ans. Br. at 8–11.

of the Partnership Agreement. None relates to the regulation of the general partner's fiduciary duties.

■ Third, under Delaware law, while partners are free to limit their fiduciary duties by contract, the parties to a limited partnership must make plain their intention to do so.[56] Where there is no clear contractual language that preempts default fiduciary duty rules, the courts of this state will continue to apply them.[57] Analogously, in the absence of a clearly expressed contractual provision to the contrary, this court will apply normal equitable limitations principles, including reference to the usual three-year limitations period.[58]

Finally, even if the court were to find that Section 12.4 was somehow ambiguous, the principle of *contra preferentum* would apply, and the court would resolve the ambiguities in favor of Werner.[59]

Therefore, Werner's claim for breach of the duty of loyalty is not time barred, and the defendants' motion to dismiss on that ground will be denied.

## 2. *The PPM Does Not Vitiate Plaintiff's Duty Of Loyalty Claim*

■ The defendants finally argue that Werner's claim for breach of the fiduciary duty of loyalty "should be dismissed because the PPM … clearly disclosed the risk that each limited partner was taking by investing in Interprise and the potential conflict of interest under which the General Partner and some of the Advisory Board members could operate."[60] While the court recognizes that it may consider the content of documents that are integral to or are incorporated by reference into the complaint for purposes of a Rule 12(b)(6) motion,[61] the PPM itself is not referenced anywhere in Werner's complaint. Relying on *Midland Food* Services, the defendants suggest that the PPM should be considered because it is referenced in the Partnership Agreement, which, in turn, is referenced in the complaint.

*Midland Food* and its progeny stand for the proposition that documents not included with the complaint should be considered when referenced therein in order to discourage the "filing of misleading complaints that strategically omit crucial information."[62] This sensible policy is not implicated here, where Werner has not referred to the PPM (or the Partnership Agreement for that matter) to make dubious assertions. Indeed, Werner's complaint does not reference the PPM at all. The defendants argue, however, that Section 1.3 of the Partnership Agreement refers to the PPM, and the PPM should

**56.** *Sonet v. Timber Co., L.P.,* 722 A.2d 319, 322 (Del.Ch.1998).

**57.** *R.S.M., Inc. v. Alliance Capital Mgmt. Holdings L.P.,* 790 A.2d 478, 497 ("[T]he court will apply default fiduciary duties in the absence of clear contractual language disclaiming their applicability").

**58.** *See* 10 *Del. C.* § 8106; *In re Dean Witter P'ship Litig.,* 1998 WL 442456 at *4 (Del.Ch. July 17, 1998).

**59.** *In re Nantucket Island Assocs. Ltd. P'ship Unitholders Litig.,* 810 A.2d 351, 361 (Del.Ch. 2002) (When a general partner drafts an agreement that is fairly susceptible to different interpretations, the court is generally required to resolve the ambiguities in favor of the limited partners).

**60.** Def. Reply Br. at 15.

**61.** *Midland Food Serv., LLC v. Castle Hill Holdings V, LLC,* 792 A.2d 920, 925 (Del.Ch. 1999).

**62.** *Id.* at 925 & n. 5; *see also In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 69 (Del.1995); *Ash/Ramunno Assocs., Inc. v. Branner,* 1993 WL 193216, at *2 (Del.Ch. May 21, 1993).

therefore be considered. This reasoning is unpersuasive. Werner's complaint makes no reference to that section of the Partnership Agreement, and the relationship of Section 1.3 to the claims at bar is ancillary at best.[63] Because the PPM is not relied upon (at all, much less selectively) in the complaint, it will not be taken into consideration for purposes of the Rule 12(b)(6) motion.[64] For that reason, the motion to dismiss the duty of loyalty claim must fail.

 Furthermore, even if the PPM were considered, it would not suffice to obviate Werner's duty of loyalty claim. The defendants submit that Werner acknowledged the potential for conflict when he received the PPM, and that "acknowledgment of the potential conflict precludes his subsequent complaint."[65] In some instances, disclosure of conflicts of interest may preclude a claim for breach of the duty of loyalty.[66] The PPM, however, did not disclose the potential for conflicts of interest with enough specificity to prevent Werner from bringing a duty of loyalty claim.[67] As the defendants properly note, "[i]t is well established that a stockholder cannot complain of corporate action in which, *with full knowledge of all the facts*, he or she has concurred."[68] Nonetheless, it cannot be said here that the boilerplate disclosures in the PPM convey full knowledge of all of the facts. Indeed, the language in the PPM does not contain any disclosure that the general partner would cause Interprise portfolio companies to enter into lucrative consulting arrangements with Answerthink. Therefore this court will deny the motion to dismiss for failure to state a claim with regard to defendants MTM LP, MTM I, and Parker.

63. Section 1.3 of the Partnership Agreement explains the purpose of the Partnership, and reads as follows:
 The Partnership is organized for the object and purpose of investing in the securities of the kind or nature described in the Private Placement Memorandum [PPM] dated January 27, 1999 as thereafter supplemented prior to the date hereof, managing and supervising such investments, and engaging in such activities incidental or ancillary thereto as the General Partner deems necessary or advisable.

64. The defendants also argue that the PPM should be considered because Werner relies upon it in his answering brief to make certain personal jurisdiction arguments. However, the analyses of motions to dismiss under Rules 12(b)(2) and 12(b)(6) are separate and distinct, and examination of the PPM for Rule 12(b)(2) purposes does not warrant consideration of the PPM for Rule 12(b)(6) purposes.

65. Def. Opening Br. at 16.

66. *See Boxer v. Husky Oil Co.*, 1983 WL 17937 (Del.Ch. June 28, 1983), *aff'd*, 483 A.2d 633 (Del.1984).

67. The two relevant portions, of the **PPM** state:

The Principals are stockholders, directors and officers of, and receive compensation in respect to services provided to, other entities. By virtue of their influence over the management of the Partnership, these individuals are therefore subject to conflicts of interest
PPM at 32.
The Partnership also intends to provide assistance to, and monitor its investments by, obtaining seats on, or rights to attend the meetings of, its portfolio companies. It is expected that David R. Parker, the General Partner's Managing Principal, will serve on the board of directors of most of the Partnership's portfolio companies. When appropriate, additional Principals and members of the Advisory Board, as well as selected outside directors nominated by the Partnership, will join the boards of directors of portfolio companies when their involvement may contribute to the success of the business.
PPM at 10.

68. Def. Opening Br. at 16 (quoting *Elster v. Am. Airlines, Inc.*, 100 A.2d 219, 221 (Del.Ch.1953)(*emphasis added*)).

## VI.

For the foregoing reasons, the motion to dismiss for lack of personal jurisdiction is **GRANTED**. The motion to dismiss for failure to state a claim for breach of the duty of care is **GRANTED** in part and **DENIED** in part. The parties shall consult and submit a form of order to the court ten days from the date of this Opinion.