**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

INTERNATIONAL PAPER COMPANY,
Plaintiff-Appellant,

v.

SCHWABEDISSEN MASCHINEN &
ANLAGEN GMBH,
Defendant-Appellee.

No. 98-2482

Appeal from the United States District Court
for the District of South Carolina, at Greenwood.
Solomon Blatt, Jr., Senior District Judge.
(CA-93-2727-9-8)

Argued: January 25, 2000

Decided: March 14, 2000

Before MOTZ and KING, Circuit Judges, and
John T. COPENHAVER, Jr., United States District Judge
for the Southern District of West Virginia,
sitting by designation.

_____

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge King and Judge Copenhaver joined.

_____

**COUNSEL**

**ARGUED:** William Jefferson Leath, Jr., LEATH, BOUCH &
CRAWFORD, Charleston, South Carolina, for Appellant. Keating
Lewis Simons, III, LAW OFFICES OF SIMONS & KEAVENY,
Charleston, South Carolina, for Appellee.

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

A buyer became dissatisfied with an industrial saw and brought suit against the manufacturer of the saw on the basis of a contract between the distributor and the manufacturer. The question presented to us is whether an arbitration clause in the distributor-manufacturer contract requires the buyer, a nonsignatory to that contract, to arbitrate its claims against the manufacturer. The district court held that it did. Concluding that the buyer cannot sue to enforce the guarantees and warranties of the distributor-manufacturer contract without complying with its arbitration provision, we affirm.

I.

Westinghouse Electric Corporation (a predecessor-in-interest of the International Paper Company) sought to purchase an industrial saw manufactured by Schwabedissen Maschinen & Anlagen GMBH, a German corporation. On April 1, 1991, Westinghouse sent to Wood Systems Incorporated, a United States distributor of Schwabedissen saws, a non-binding letter of intent to purchase a new Schwabedissen double trim saw. Westinghouse personnel then visited Schwabedissen's facility in Germany to observe its production process. Upon their return, in a purchase order from Westinghouse to Wood dated May 17, 1991, Westinghouse agreed to buy and Wood agreed to sell the Schwabedissen saw, in accordance with a performance guarantee and certain specifications.

On June 6, 1991, Schwabedissen sent Wood an "Order Confirmation/Contract" for the saw Westinghouse sought to purchase, which included extensive specifications. Schwabedissen contends, and the district court found, that this contract also included the terms of two additional documents--the "General Conditions for the Supply and Erection of Plant and Machinery for Import and Export No. 188A, prepared under the auspices of the United Nations Economic Commission for Europe" (the "General Conditions"), and the "Annex attached to the General Conditions for the Supply and Erection of Plant and Machinery for Import and Export by the German Mechanical Engineering Industry" (the "Annex"). The "General Conditions"

2

contain an arbitration clause providing that "[a]ny dispute arising out of the Contract shall be finally settled, in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce, by one or more arbitrators designated by those Rules," and establish the governing law as that of the country of the contractor. The "Annex" permits the contractor to bring an action before a court rather than an arbitrator "unless and until the dispute has been referred to arbitration by one of the parties."

On June 12, 1991, Wood sent a purchase order for the saw to Schwabedissen, together with the specifications from Westinghouse's purchase order. In response, Schwabedissen arranged for delivery of the saw, which was installed at Westinghouse's plant in late December 1991. According to Westinghouse, the saw "completely failed to properly operate once installed or at anytime thereafter." No written contract ever existed between Westinghouse and Schwabedissen, but Westinghouse maintains that when difficulty arose as to the saw's operation, Schwabedissen orally agreed to repair the saw, but failed to do so.

On July 9, 1993, after Wood declared bankruptcy, Westinghouse filed a complaint against Schwabedissen in South Carolina state court, alleging breach of contract, rejection, and breach of warranties based on the May 17, 1991, purchase order between Westinghouse and Wood. Westinghouse alleged that Wood acted as an agent for Schwabedissen and therefore Schwabedissen was liable under that purchase order. Schwabedissen removed the case to federal court.

On September 21, 1994, Westinghouse filed an amended complaint, in which it added allegations based on the Wood-Schwabedissen contract and asserted that it was a third-party beneficiary of that contract. Schwabedissen then moved to stay the federal court proceedings pending arbitration, relying on the arbitration clause contained in its contract with Wood.

At argument on the motion to stay, Westinghouse maintained that as a third-party beneficiary of the Wood-Schwabedissen contract, it could compel arbitration in any disputes with a party to the contract, but that a party could not compel a third-party beneficiary to arbitrate. Responding to the district court's skepticism about this contention,

3

Westinghouse withdrew its third-party beneficiary claim. The district court then continued the hearing to allow the parties to brief the issues without that claim.

When the district court again heard argument, Westinghouse contended that it had no knowledge of, and so could not be bound by, the "General Conditions" (containing the arbitration clause) assertedly made part of the Wood-Schwabedissen contract. The district court rejected this argument, reasoning that because Westinghouse sought "to take advantage of certain commitments that were made by Schwabedissen to" Wood in the Wood-Schwabedissen contract, it was bound by all commitments in that contract, including the arbitration provision.

Westinghouse then argued that, notwithstanding an affidavit of a Schwabedissen employee that the Wood-Schwabedissen contract included the "General Conditions," nothing in the June 6 contract nor June 12 purchase order indicated that Wood had in fact accepted the "General Conditions" as part of its contract with Schwabedissen. The district court again continued the hearing on the motion to stay to allow further discovery. At the subsequent hearing, Schwabedissen produced an agreement between itself and Wood dated February 24, 1993, indicating that the "General Conditions" were part of the June 6 Wood-Schwabedissen contract. Westinghouse offered no contrary evidence. The district court found that the "General Conditions" were part of the Wood-Schwabedissen contract and that Westinghouse was subject to the arbitration provision; therefore, the court granted Schwabedissen's motion to stay proceedings pending arbitration. The district court also substituted the International Paper Company, which had purchased certain Westinghouse assets, for Westinghouse in the litigation.

International Paper filed a request for arbitration before the International Court of Arbitration in Geneva. At the conclusion of the arbitral proceedings, the arbitrators ruled in Schwabedissen's favor. The arbitrators concluded that International Paper had asserted no basis for recovery against Schwabedissen because no contract existed between Schwabedissen and Westinghouse (International Paper's predecessor-in-interest), Wood was not an agent for Schwabedissen, and Westinghouse was not a third-party beneficiary of the Wood-Schwabedissen

4

contract. The arbitrators also assessed costs against International Paper.

When International Paper refused to comply with the arbitration award, Schwabedissen sought its enforcement in the district court. International Paper moved for leave to file a second amended complaint, seeking to allege a breach of both an implied warranty of workmanlike service and an oral contract to repair. The district court granted Schwabedissen's motion to enforce the arbitral award and denied International Paper's motion for leave to amend. International Paper now appeals.[1]

II.

International Paper claims that the district court erred in finding that the Schwabedissen-Wood contract contains an arbitration clause. It further contends that even if the contract contains such a clause, it was not bound to adhere to it.

A.

Initially, International Paper contends that the Wood-Schwabedissen contract contains no arbitration clause. International Paper argues that the June 12 purchase order Wood sent to Schwabedissen was "the actual contract" between Wood and Schwabedissen, and that the parties never incorporated the "General Conditions," which contain the arbitration clause, into that contract.[2]

_____

[1] Schwabedissen maintains International Paper has failed to invoke our jurisdiction over all of the issues in the case because International Paper noted an appeal from the district court's order enforcing the arbitral award, not its final order assessing post-judgment interest. The contention is meritless. See Firstier Mortgage Co. v. Investors Mortgage Ins. Co., 498 U.S. 269, 276 (1991) ("[W]hen a district court announces a decision that would be appealable if immediately followed by the entry of judgment," then "a notice of appeal from a nonfinal decision . . . operate[s] as a notice of appeal from the final judgment.").

[2] It is unclear whether International Paper argues on appeal that the June 12 purchase order constituted the sole Wood-Schwabedissen contract, i.e., that the Wood-Schwabedissen contract does not include the

5

Schwabedissen submitted an affidavit from one of its employees stating that the Wood-Schwabedissen contract included the "General Conditions." In addition, Schwabedissen offered a separate agreement signed by Schwabedissen and Wood, dated February 24, 1993, that referenced the contract for the saw sold to Westinghouse and stated that the "General Conditions" were attached to that contract. Although International Paper failed to contradict this evidence in any way, it nonetheless claims that the district court erred in finding that "the only reasonable inference that [it could] get from [the evidence] was that the arbitration agreement was a part of the[Wood-Schwabedissen] contract."

We review factual findings that form the basis of a decision as to whether the parties have agreed to submit a dispute to arbitration for clear error. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 947-48 (1995). We find no error in the district court's factual finding that the Wood-Schwabedissen contract included the "General Conditions" containing the arbitration clause. Indeed, International Paper offered nothing to counter Schwabedissen's evidence in support of this finding.

B.

International Paper's principal contention is that even if the Wood-Schwabedissen contract contains an arbitration clause, that clause cannot be enforced against International Paper, a non-signatory to the Wood-Schwabedissen contract.**3**

_____

June 6 "Order/Confirmation Contract." International Paper does not expressly so contend and the argument appears to be frivolous. International Paper itself concedes that the June 12 purchase order between Wood and Schwabedissen was preceded by the far more detailed June 6 "Order/Confirmation Contract." In any event, because International Paper never contended in the district court that the June 12 purchase order between Wood and Schwabedissen constituted the sole Wood-Schwabedissen contract, we refuse to consider that argument on appeal. See United States v. Banisadr Bldg. Joint Venture , 65 F.3d 374, 379 (4th Cir. 1995).

**3** The arbitration clause is a broad one, requiring arbitration of "[a]ny dispute arising out of the Contract." International Paper makes no argument that the clause, if binding on it, does not cover the claims asserted in its complaint.

6

Generally, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960); see also AT & T Techs., Inc. v. Communications Workers, 475 U.S. 643, 648 (1986). While a contract cannot bind parties to arbitrate disputes they have not agreed to arbitrate, "[i]t does not follow . . . that under the [Federal Arbitration] Act an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision." Fisser v. International Bank, 282 F.2d 231, 233 (2d Cir. 1960). Rather, a party can agree to submit to arbitration by means other than personally signing a contract containing an arbitration clause.

Well-established common law principles dictate that in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties.[4] For example, in J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 320-21 (4th Cir. 1988), we explained that when allegations against "a parent company and its subsidiary are based on the same facts and are

_____

[4] The Supreme Court has directed that we "apply ordinary state-law principles that govern the formation of contracts," First Options, 514 U.S. at 944, and the "federal substantive law of arbitrability." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). Thus state law determines questions "concerning the validity, revocability, or enforceability of contracts generally," Perry v. Thomas, 482 U.S. 483, 493 n.9 (1987), but the Federal Arbitration Act, 9 U.S.C. § 2 (1994), and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, enforced by 9 U.S.C. §§ 201-08 (1994), "create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." Moses H. Cone Mem'l Hosp., 460 U.S. at 24. These statutes constitute "a congressional declaration of liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." Id. The policy applies "with special force in the field of international commerce." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 631 (1985). Because the determination of whether International Paper, a nonsignatory, is bound by the Wood-Schwabedissen contract presents no state law question of contract formation or validity, we look to the "federal substantive law of arbitrability" to resolve this question.

7

inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement." We further explained that"[t]he same result has been reached under a theory of equitable estoppel." Id.; see also Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc. , 10 F.3d 753, 757-78 (11th Cir. 1993) (holding that because claims against nonsignatory parent were "intimately founded in and intertwined with" a contract containing an arbitration clause, signatory was estopped from refusing to arbitrate those claims); Hughes Masonry Co. v. Greater Clark County Sch. Bldg. Corp., 659 F.2d 836, 840-41 (7th Cir. 1981) (finding signatory equitably estopped from repudiating arbitration clause in agreement on which suit against nonsignatory was based). Moreover, the Second Circuit recently noted that it had recognized that five theories "aris[ing] out of common law principles of contract and agency law" could provide a basis "for binding nonsignatories to arbitration agreements: 1) incorporation by references; 2) assumption; 3) agency; 4) veil piercing/alter ego; and 5) estoppel." Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995) (citing cases); see also Bel-Ray Co. v. Chemrite (PTY) Ltd., 181 F.3d 435, 440-43 (3d Cir. 1999); Amoco Transport Co. v. Bugsier Recderei & Bergungs, A.G. (In re Oil Spill By the"Amoco Cadiz"), 659 F.2d 789, 795-96 (7th Cir. 1981).**5**

_____

**5** Such cases have spawned a burgeoning array of secondary authorities. See, e.g., H. Warren Knight et al., Arbitration By and Against Nonsignatories, in California Practice Guide: Alternative Dispute Resolution, at §§ 5:261 to :288 (1998); Hope T. Stewart, The Equitable Estoppel Argument for and Against Commercial Arbitration: From Hughes Masonry Co., Inc. v. Clark County School Building Corp. to Northern, Ltd. v. R.E. James, 103 Com. L.J. 336 (1998); David F. Sawrie, Special Project, Equitable Estoppel and the Outer Boundaries of Federal Arbitration Law: The Alabama Supreme Court's Retrenchment of an Expansive Federal Policy Favoring Arbitration , 51 Vand. L. Rev. 721 (1998); Jeff DeArman, Comment, Resolving Arbitration's Nonsignatory Issue: A Critical Analysis of the Application of Equitable Estoppel in Alabama Courts, 29 Cumb. L. Rev. 645 (1998-1999); Scott M. Mckinnis, Note, Enforcing Arbitration with a Nonsignatory: Equitable Estoppel and Defensive Piercing of the Corporate Veil, 1995 J. Disp. Resol. 197; Shea Welch, Comment, Arbitration Agreements: Standard of Review, Interpretation and Who is Bound, 1997 J. Disp. Resol. 271.

We believe that the doctrine of equitable estoppel applies here. Equitable estoppel precludes a party from asserting rights "he otherwise would have had against another" when his own conduct renders assertion of those rights contrary to equity. First Union Commercial Corp. v. Nelson, Mullins, Riley & Scarborough (In re Varat Enters., Inc.) 81 F.3d 1310, 1317 (4th Cir. 1996); see also Lowery v. Stovall, 92 F.3d 219, 223 (4th Cir. 1996). In the arbitration context, the doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him. "To allow [a plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act." Avila Group, Inc. v. Norma J. of California, 426 F. Supp. 537, 542 (S.D.N.Y. 1977).

A nonsignatory is estopped from refusing to comply with an arbitration clause "when it receives a `direct benefit' from a contract containing an arbitration clause." American Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349, 353 (2d Cir. 1999) (citing Thomson-CSF, 64 F.3d at 778-79); Deloitte Noraudit A/s v. Deloitte Haskins & Sells, 9 F.3d 1060, 1064 (2d Cir. 1993) (holding nonsignatory bound to arbitrate when it knew of the arbitration agreement and "knowingly accepted the benefits of" that agreement); cf. Hughes Masonry Co., 659 F.2d at 838-39 ("[I]t would be manifestly inequitable to permit Hughes to both claim that J.A. [a nonsignatory] is liable to Hughes for its failure to perform the contractual duties described in the [arbitration agreement] and at the same time deny that J.A. is a party to that agreement in order to avoid arbitration of claims clearly within the ambit of the arbitration clause."). **6**

_____

**6** Some courts have, at a nonsignatory's instance, required a signatory of an arbitration agreement to arbitrate with the nonsignatory because of "the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract . . . and [the fact that] the claims were `intimately founded in and intertwined with the underlying contract obligations.'" Sunkist, 10 F.3d at 757 (quoting McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co., 741 F.2d 342, 344 (11th Cir. 1984)). The Second Cir-

9

Applying these principles here we can only conclude that International Paper is estopped from refusing to arbitrate its dispute with Schwabedissen. The Wood-Schwabedissen contract provides part of the factual foundation for every claim asserted by International Paper against Schwabedissen. In its amended complaint, International Paper alleges that Schwabedissen failed to honor the warranties in the Wood-Schwabedissen contract, and it seeks damages, revocation, and rejection "in accordance with" that contract. International Paper's entire case hinges on its asserted rights under the Wood-Schwabedissen contract; it cannot seek to enforce those contractual rights and avoid the contract's requirement that "any dispute arising out of" the contract be arbitrated. The district court did not err in so holding.[7]

III.

Alternatively, International Paper urges us to refuse to enforce the arbitration clause in the Wood-Schwabedissen contract because that clause is assertedly flawed and fundamentally unfair. For this contention International Paper relies on our recent decision in Hooters of

_____

cuit has held, however, that a "close relationship" and "intimate[ ]" factual connection provide no independent basis to require a nonsignatory of an arbitration agreement to arbitrate with a signatory, and therefore that a nonsignatory cannot be bound without receiving a "direct benefit" from or pursuing a "claim . . . integrally related to the contract containing the arbitration clause." Thomson-CSF, 64 F.3d at 778-80. We need not reach this question here because International Paper clearly does seek a "direct benefit" from the Wood-Schwabedissen agreement and makes a "claim . . . integrally related to" that contract.

[7] For the same reason, we reject International Paper's claim that the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, see 9 U.S.C.A. § 201 (West 1999), precludes enforcement of the arbitral award because it requires United States courts to enforce international arbitration agreements only against parties to "an agreement in writing." Art. II, ¶ 1. As we have previously recognized, the estoppel doctrine also applies to non-signatories to arbitration agreements governed by the Convention. See J.J. Ryan & Sons , 863 F.2d at 320-21; see also Smith/Enron Cogeneration Ltd. Partnership v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 97-98 (2d Cir. 1999).

10

America, Inc. v. Phillips, 173 F.3d 933 (4th Cir. 1999), in which we found that an employer "materially breached the arbitration agreement by promulgating rules so egregiously unfair as to constitute a complete default of its contractual obligation to draft arbitration rules and to do so in good faith." Id. at 938. In Hooters, we concluded that the plaintiff employee was not required to submit to "rules . . . so one-sided that their only possible purpose is to undermine the neutrality of the proceeding." Id.

The contractual arbitration provision in Hooters allowed the employer, but not its employees, "to bring suit in court to vacate or modify an arbitral award when it [the employer] can show, by a preponderance of the evidence, that the panel exceeded its authority." Id. at 939. The Hooters arbitration clause required employees to provide the company notice of any claim, including "`the nature of the Claim'" and "`the specific act(s) or omission(s) which are the basis of the Claim,'" as well as "a list of all fact witnesses with a brief summary of the facts known to each," but the company was not required to file any responsive pleadings, notice of its defenses, or lists of witnesses. Id. at 938. The contract provided that arbitrators were to be chosen from a list of arbitrators "created exclusively by Hooters"; the employer was free to place on that list arbitrators with "existing relationships, financial or familial" with the company. Id. at 939. Furthermore, once proceedings began, employees were not permitted to raise any matters not raised in the initial notice, nor were the employees allowed to audio or videotape the arbitration hearing--though the company was permitted to do this. Id.

By contrast, in this case, the sole arbitration provision with which International Paper finds fault permits Schwabedissen "to bring an action, instead of before an arbitrator, before the ordinary court of his residence or of his principal place of business, or before the ordinary court having jurisdiction over the Purchaser, unless and until the dispute has been referred to arbitration by one of the parties." (Emphasis added.) This provision does nothing more than give Schwabedissen a limited right to bring a judicial action in the event that the other party expresses no interest in arbitration. The arbitration clause at issue here contains none of the features so objectionable in the arbitration clause at issue in Hooters. Rather than requiring the adverse party to choose their arbitrators from a pool selected strictly

11

by Schwabedissen, the clause requires (by mandating compliance with International Chamber of Commerce Rules) that every arbitrator "remain independent of the parties involved in the arbitration." International Chamber of Commerce, ICC Rules of Conciliation and Arbitration 14 (1990). Unlike the Hooters provision, the Wood-Schwabedissen arbitration clause contains unexceptional filing and notice requirements. Indeed, the arbitration process required under the Wood-Schwabedissen agreement differs in virtually every respect from the egregiously unbalanced, unfair process in Hooters.

Accordingly, we reject International Paper's assertion that the arbitration provision at issue here is flawed and unfair.**8**

IV.

Finally, International Paper contends that the district court erred in denying its motion for leave to amend its complaint for a second time to allege two additional causes of action: breach of an implied warranty of workmanlike service and breach of an oral contract to repair.

"We review a district court's decision to grant or deny a party leave to amend for an abuse of discretion." Edwards v. City of Goldsboro, 178 F.3d 231, 242 (4th Cir. 1999). "Delay alone is an insufficient reason to deny leave to amend." Id. But when a district court finds that a party's delay in moving to amend is accompanied by "prejudice, bad faith or futility," it does not abuse its discretion in refusing to permit the amendment. Id.

International Paper filed its original complaint in July 1993; the district court granted it leave to amend that complaint in September 1994. The company did not seek to amend its complaint a second time until June 12, 1998--five years after it initiated this action and four years after it had been granted leave to file its first amended complaint. Moreover, International Paper did not request a second opportunity to amend its complaint until after it had unsuccessfully

_____

**8** We have also carefully considered International Paper's other arguments as to why the district court should not have enforced the arbitration clause and find them all meritless.

12

participated in lengthy international arbitration proceedings and numerous hearings before the district court.

The district court denied the motion, finding that the amendment would prejudice Schwabedissen; the court explained, "it is five years after you brought the suit, six years after you knew about [the new causes of action], when it could have been handled--already handled and now you want to start over." International Paper demurred that the two theories it wished to add were not new but had been alleged in its earlier complaints; it also contended that the further amendment to the complaint simply sought "to clean up that pleading and to amplify the allegations already made." The district court rejected this argument, explaining that if International Paper had indeed asserted the allegations in its earlier complaints, then the allegations should have been addressed in the arbitration proceedings; thus, the proposed amendment would be futile. The district court's reasoning was sound; it certainly did not abuse its discretion in refusing to permit the amendment.

V.

For all of these reasons, the judgment of the district court is

AFFIRMED.

13