# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SUSTAINABILITY PARTNERS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0742-SG |
| | ) | |
| JOEL JACOBS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  March 20, 2020
Date Decided:  June 11, 2020

Kathleen M. Miller and Jason Z. Miller, of SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware, *Attorneys for Plaintiff.*

Jeffrey Goddess, of COOCH AND TAYLOR, P.A., Wilmington, Delaware: OF COUNSEL: Robert A. Goodin, of GOODIN, MACBRIDE, SQUERI & DAY, LLP, San Francisco, California, *Attorneys for Defendant.*

GLASSCOCK, Vice Chancellor

This action contains an unusual issue of personal jurisdiction. The Defendant, Joel Jacobs, had been an at-will employee of the Plaintiff, Sustainability Partners LLC ("SP" or the "Company"). His employment was terminated; shortly thereafter, he was engaged by the Company as an independent contractor. The Company presented Jacobs with a form of independent contractor agreement. Jacobs was unsatisfied with the agreement, and declined to enter it, expressing that whatever agreement the parties reached should include a substantial equity transfer to Jacobs. Jacobs continued to work for the Company for a little more than a year as an independent contractor, at which point he was fired for disparaging SP. After his termination, Jacobs communicated to the Company that he considered SP in breach of a purported oral agreement (the "Oral Agreement") to transfer equity to him, made by SP's CEO.

The Plaintiff—the natural defendant of a breach of contract action based on the Oral Agreement—brought this declaratory judgment action, seeking a declaration that Jacobs has no rights under the Oral Agreement.[1] Jacobs, a California resident, has moved for dismissal on the ground that this Court is without personal jurisdiction over him. The only ground on which the Company asserts personal jurisdiction is through the forum selection clause in its Operating Agreement, which

[1] As described below, I dismissed a second request for declaratory judgment—that Jacobs is not an equity holder in the Plaintiff—from the bench after oral argument as moot.

1

provides for a Delaware forum. The Plaintiff's theory is that if Jacobs had an enforceable agreement to receive equity, as he contends, as an equity holder he would be subject to the Operating Agreement and its forum selection clause; therefore, he should be deemed to have consented to Delaware jurisdiction. It notes that, as the party to a prior equity agreement—which never vested—Jacobs was a signatory to a prior version of the Operating Agreement, and was well aware of its forum selection clause. Jacobs asserts that he does not contend that he is an equity holder in SP, nor has he or will he assert a right to specific performance of the Oral Agreement. He only seeks damages for breach of the Oral Agreement.

Thus the parties' positions as to jurisdiction are as turned about as is their status as Plaintiff and Defendant. The Company denies that any agreement exists under which Jacobs was entitled to equity. It maintains that *had* the Oral Agreement existed, however, it would have provided (via the Operating Agreement) for Delaware jurisdiction. As a consequence, per SP, it may hale Jacobs into this Court to defend against its assertion that the Oral Agreement does not exist. Jacobs, conversely, claims that he was entitled to equity in SP, but that he never received it. Therefore, he argues, he is not an equity holder subject to the Operating Agreement, and has not submitted to Delaware jurisdiction thereby.

An agreement to litigate in Delaware can serve as a consent to the jurisdiction of this Court. However, on examination of the allegations here, I note that neither

2

party is asserting that Jacobs is a party to the Operating Agreement. Instead, the Plaintiff argues that the consequence of the Oral Agreement as asserted by Jacobs—the existence of which the Company denies—is that Jacobs has consented to Delaware jurisdiction. Such a decision would, to my mind, contain more of metaphysics than jurisprudence. For the reasons that follow, I find that this Court lacks personal jurisdiction over Jacobs; accordingly, the matter is dismissed.

## I. BACKGROUND[2]

### A. *The Parties*

Plaintiff SP is a Delaware limited liability company with its principal place of business in Arizona.[3]

Defendant Jacobs is a former employee of SP and a resident of California.[4]

### B. *Factual Background*

SP's predecessor, GSV Sustainability Partners, Inc. ("GSV"), hired Jacobs on February 3, 2016 as an independent consulting contractor.[5] In July 2016, SP was formed and purchased all GSV's assets.[6] A month later, in August 2016, SP entered

---

[2] I draw all facts from the Plaintiff's Verified Amended Complaint for Declaratory Relief, D.I. 6 ("Am. Compl.") and documents incorporated therein. As discussed further below, all well-pled facts are considered true for the sake of this motion.

[3] Am. Compl., ¶ 4.

[4] *Id.* ¶¶ 5, 17.

[5] *Id.* ¶ 17.

[6] *Id.* ¶ 8.

an employment agreement with Jacobs (the "Employment Agreement").[7] At the same time as he entered the Employment Agreement, Jacobs executed an At-Will Employment, Confidential Information and Invention Assignment Agreement (the "Confidentiality Agreement"), and an Equity Grant Agreement (the "Equity Grant Agreement").[8]

The Equity Grant Agreement entitled Jacobs to 471 Class C Units vesting over the course of the next four years.[9] Vesting would cease upon termination.[10] SP's operating agreement (the "Operating Agreement") contains several requirements related to issuing membership units, including Class C Units. The Operating Agreement states that "[t]he rights and obligations of holders of Class C Units . . . shall be as set forth in the Securityholders Agreement and the Management Subscription Agreement by which such Class C Units are awarded and, to the extent applicable, this Agreement. . ."[11] The Operating Agreement defines "Management

---

[7] *Id.* ¶ 17.

[8] *Id.* The Equity Grant Agreement was governed by Delaware law. *Id.* ¶ 21. Although not included in the Complaint, SP states in its briefing that "in connection with an equity grant in 2016 . . . Jacobs signed the Amended and Restated Limited Liability Company Agreement, dated as of August 22, 2016." Pl.'s Answering Br. in Opp'n to Def.'s Mot. to Dismiss, D.I. 9 ("Pl.'s Answering Br."), at 2–3. In other words, Jacobs signed a previous version of the Company's operating agreement, which the current version subsequently superseded. Pl.'s Answering Br., at 2–3. He did not sign the current version of the operating agreement. Pl.'s Answering Br., at 3 ("[Plaintiff] agree[s] that [Jacobs] did not sign the SP Operating Agreement after the alleged oral agreement in July 2017. . .").

[9] Am. Compl., ¶ 19.

[10] *Id.* ¶ 20.

[11] *Id.* ¶ 10.

4

Subscription Agreement" as "any and all of the subscription agreements, contribution agreements, grant agreements or other similar agreements pursuant to which the Company may issue any Membership Interest to any of its Subsidiaries' officers, managers, directors, employees, consultants or independent contractors of the Company . . . ."[12]  The Operating Agreement further provides that "[a]ll Membership Interests shall be represented by Units."[13]  In short, an owner of SP's equity becomes a member subject to the Operating Agreement and must enter a "Management Subscription Agreement" with the Company.[14]

SP's Operating Agreement contains a forum selection clause:

> Any and all suits, legal actions or proceedings arising out of this Agreement (including against any manager or officer of the Company) shall be brought solely in the state or federal courts of the State Of Delaware sitting in the county, city and state of Delaware, and each member hereby submits to and accepts the exclusive jurisdiction of such courts for the purpose of such suits, legal actions or proceedings.[15]

---

[12] *Id.* ¶ 11.

[13] *Id.* ¶ 12.

[14] *See id.* ¶¶ 13–14.  The Operating Agreement also contains various payout restrictions based on the unit class.  *Id.* ¶ 15.

[15] *Id.* ¶ 16 (original in caps).  There is, I note, no "County of Delaware" in the State of Delaware. There is a Delaware City in this state, but I take judicial notice of the fact that no state or federal court sits in Delaware City.

5

On April 12, 2017, the parties amended Jacobs' Employment Agreement.[16] As a part of that amendment, Jacobs released all claims against the Company, including:

> any and all claims relating to, or arising from, [the] right to purchase, or actual purchase of shares of stock or equity interest of the Company; (g) any claims arising out of or related to the Employment Agreement; and (h) any and all other claims arising from [the] employment relationship with, or equity ownership in, the Company or its subsidiaries.[17]

SP terminated Jacobs' employment on June 30, 2017, before any of his equity vested.[18] Following his termination as an employee, Jacobs resumed work for SP the next month as an independent contractor.[19] It appears that the parties intended the independent contractor position to be temporary while Jacobs transitioned back to employee status.[20] As a part of the new position, SP's CEO, Thomas Cain, provided Jacobs with an independent contractor agreement.[21] Jacobs informed Cain that he wanted a revised or a new agreement, but Cain told him to mark up the existing agreement with his proposed changes.[22] Jacobs did not revise the

---

[16] *Id.* ¶ 22.

[17] *Id.* Jacobs received $50,000 in cash for the release. *Id.* ¶ 32.

[18] *Id.* ¶ 23.

[19] *Id.* ¶¶ 24–25.

[20] *Id.* ¶ 40.

[21] *Id.* ¶¶ 24, 38.

[22] *Id.* ¶ 38.

agreement; instead, he emailed Cain with comments, including, regarding equity ownership, that he thought a "15% to 17.5% total equity" range might be acceptable.[23] Jacobs expressed dissatisfaction with the proposed equity vesting schedule, but he did not suggest a new one.[24] Although Jacobs never signed the independent contractor agreement, the parties operated under it going forward.[25] Jacobs confirmed his independent contractor status multiple times.[26]

Around this time, Jacobs was attempting to obtain a personal loan.[27] To this end, a few days after their exchange regarding the independent contractor agreement, Jacobs emailed Cain seeking confirmation of various financial information to provide to his lender.[28] Among other things, he sought to confirm his equity ownership status: "Equity: To be determined but currently expected at 15% or higher."[29] Cain responded, "Confirmed."[30]

The parties came into conflict in November 2018 when Jacobs made disparaging comments regarding SP that caused it to lose an investment.[31] SP

---

[23] *Id.*

[24] *Id.* ¶ 39.

[25] *See id.* ¶¶ 41–42.

[26] *Id.* ¶¶ 26–28.

[27] *Id.* ¶ 43.

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.* ¶ 29.

allowed Jacobs to continue to work as an independent contractor after receiving assurance that he would not repeat the comments or speak to other investors.[32]  On April 16, 2019, SP terminated its independent contractor relationship with Jacobs.[33]  Instead of cutting ties completely, it offered to re-categorize him as a "Development Partner" with reduced compensation and a new equity grant plan.[34]  It revoked that offer three days later when it learned that Jacobs had once again disparaged SP to customers.[35]

After his relationship with SP ended, Jacobs asserted that he had a contractual right to a 15% equity interest in the Company by way of an agreement with CEO Thomas Cain, which I have referred to here as the Oral Agreement.[36]

*C. Procedural History*

Plaintiff SP filed its initial complaint seeking a declaratory judgment on September 16, 2019.[37]  Defendant Jacobs moved to dismiss on October 10, 2019.[38]  The Plaintiff filed an amended complaint (the "Amended Complaint") on December

---

[32] *Id.*

[33] *Id.* ¶ 30.

[34] *Id.*

[35] *Id.* ¶ 31.

[36] *See id.* ¶¶ 35–37.

[37] Verified Compl. for Declaratory J. that Def. is not an Equity Owner, D.I. 1.

[38] Def.'s Mot. to Dismiss for Lack of Jurisdiction and Insufficiency of Service, D.I. 3.

16, 2019.[39]  The Defendant moved to dismiss the Amended Complaint on January 15, 2020.[40]   The Amended Complaint contains two counts for Declaratory Judgement: that Jacobs is not an equity holder in SP (Count I); and that SP has no contractual obligation to issue equity to Jacobs (Count II).  At argument on March 20, 2020, I dismissed the Plaintiff's first Count as moot, based on Jacobs' agreement that he is not a member of or equity holder in SP.[41]  I took the question of jurisdiction regarding Count II under consideration at that time.

## II. ANALYSIS

SP brings two counts for declaratory judgment under 10 *Del. C.* § 6501.  That statute vests this Court with "power to declare rights, status and other legal relations whether or not further relief is or could be claimed . . . The declaration may be either affirmative or negative in form and effect, and such declaration shall have the force and effect of a final judgment or decree."[42]  As described above, in Count I of its Amended Complaint, SP seeks a declaration that "Jacobs (i) owns no equity in the Company, (ii) is not a Member, [and] (iii) owns no Membership Interest in the

---

[39] Verified Am. Compl. for Declaratory Relief, D.I. 6.

[40] Def.'s Mot. to Dismiss for Lack of Jurisdiction and Insufficiency of Service, D.I. 8.

[41] At the time I dismissed Count I, the Plaintiff sought an order that confirmed Jacobs' concession of his non-ownership status.  I found such an order unnecessary.  Because Jacobs represented to the Court unequivocally that he is not and never was an owner of SP equity, and because I relied on that assertion in granting his request to dismiss Count I, Jacobs is judicially estopped from representing the contrary in subsequent litigation.  He conceded as much at oral argument.

[42] 10 *Del. C.* § 6501.

Company. . ."[43]  Because Jacobs affirmed all these statements, I dismissed Count I as moot at argument.

In Count II, SP seeks a declaration that "the Company did not form a contract for the issuance of Units to Jacobs and accordingly, Jacobs has no claim for damages for breach of contract."[44]  In other words, rather than waiting to defend a contract action brought by Jacobs, SP seeks to forestall such an action through a declaration from this Court that no such contract existed.  Jacobs seeks to dismiss Count II for lack of personal jurisdiction under Chancery Court Rule 12(b)(2) as well as lack of subject matter jurisdiction under Rule 12(b)(1).[45]  I find that this Court lacks personal jurisdiction over Jacobs, and so I grant his Motion to Dismiss on that ground and do not address the parties' subject matter jurisdiction arguments.

*A. Personal Jurisdiction*

Jacobs has moved to dismiss the Plaintiff's claim under Chancery Court Rule 12(b)(2) for lack of personal jurisdiction.[46]  When faced with a motion to dismiss pursuant to Rule 12(b)(2), "the plaintiff bears the burden of showing a basis for the

---

[43] Am. Compl., at 20, Prayer for Relief.

[44] Am. Compl., at 20, Prayer for Relief.

[45] Ch. Ct. R. 12(b)(1)-(2).

[46] Ch. Ct. R. 12(b)(2).  Jacobs also moved to dismiss under Rules 12(b)(4) and 12(b)(5) for insufficiency of process and service of process but did not argue on these grounds in his briefing or at argument.  To the extent not waived they are mooted by my finding in this Opinion.

court's exercise of jurisdiction over the defendant."[47] When ruling on a 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery of record—where no evidentiary hearing has been held, "the plaintiff[] need only make a prima facie showing of personal jurisdiction and the record is construed in the light most favorable to the plaintiff."[48] In considering a 12(b)(2) motion, the court employs a two-step analysis: "the court must first determine that service of process is authorized by statute and then must determine that the exercise of jurisdiction over the nonresident defendant comports with traditional due process notions of fair play and substantial justice."[49]

Here, SP argues that Jacobs is bound by the forum selection clause in SP's Operating Agreement. "A forum selection clause is one avenue to expressly consent to personal jurisdiction."[50] If a party gives consent expressly through a forum selection clause, then the second prong of the analysis—due process—is satisfied.[51]

---

[47] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007) (citing *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318 (Del. Ch. 2003)).

[48] *Id.* (internal citations and quotation marks omitted).

[49] *Id.* (citing *Amaysing Techs. Corp. v. CyberAir Commc'ns., Inc.*, 2005 WL 578972, at *3 (Del. Ch. Mar. 3, 2005)).

[50] *Alstom Power Inc. v. Duke/Flour Daniel Caribbean S.E.*, 2005 WL 407206, at *2 (Del. Super. Jan. 31, 2005) (citation omitted).

[51] *Capital Grp. Cos., Inc. v. Armour*, 2004 WL 2521295, at *2 (Del. Ch. Nov. 3, 2004) (if a party is bound by a forum selection clause, a minimum contacts analysis is not required).

11

Jacobs did not sign SP's Operating Agreement.[52] SP asserts that he is nonetheless bound. It relies on the principle of equitable estoppel, which "prevents a non-signatory to a contract from embracing the contract, and then turning her back on the portions of the contract, such as a forum selection clause, that she finds distasteful."[53]

To address whether a non-signatory may nonetheless be bound to a forum selection clause in a contract, this Court has developed a three-step analysis adopted from federal case law and elaborated in *Capital Group Cos. v. Armour*:[54] "First, is the forum selection clause valid? Second, are the defendants third-party beneficiaries, or closely related to, the contract? Third, does the claim arise from their standing relating to the . . . agreement?"[55] For a non-signatory to be bound by a contract's forum selection clause, the answer to all three questions must be yes.[56]

---

[52] As noted in the factual recitation, as a part of his original employment with SP, Jacobs signed a *previous* version of the operating agreement no longer in effect. According to SP, this shows that he is "no stranger" to the Operating Agreement. Pl.'s Answering Br., at 2–3. SP does not argue that signing a previous version, of itself, confers personal jurisdiction with regard to a separate Operating Agreement, or that it makes Jacobs a party to the current Operating Agreement.

[53] *Capital Grp.*, 2004 WL 2521295, at *6 (quoting *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000)).

[54] 2004 WL 2521295 (Del. Ch. Oct. 29, 2004).

[55] *Id.* at *5 (citing *Hadley v. Shaffer*, 2003 WL 21960406, at *4 (D. Del. Aug. 12, 2003)).

[56] *Neurvana Med., LLC v. Balt USA, LLC*, 2019 WL 4464268, at *3 (Del. Ch. Sept. 18, 2019), *reargument denied*, 2019 WL 5092894 (Del. Ch. Oct. 10, 2019).

The parties do not dispute the validity of the forum selection clause in the Operating Agreement, and so I focus on the second part of the analysis as the operative inquiry.

The second question in the analysis asks whether the defendant is a third-party beneficiary, or closely related to, the contract. SP does not argue that Jacobs is a third-party beneficiary; it argues only that he is "closely related" to the Operating Agreement.[57] "Under Delaware law, '[t]he 'closely-related' concept expands the availability of the equitable estoppel doctrine to encompass parties who would not technically meet the definition of third-party beneficiaries.'"[58] However, "[t]his Court will expand the doctrine in this manner only if: '(1) [the party] receives a direct benefit from the agreement; or (2) it was foreseeable that [the party] would be bound by the agreement.'"[59] SP argues that both conditions apply.[60] I analyze each in turn. I assume, without deciding and for purposes of this analysis, that if Jacobs had actually been issued equity in SP, he would have been bound by the terms of the Operating Agreement, including the forum selection clause.[61]

---

[57] *See* Pl.'s Answering Br., at 31–32.

[58] *Neurvana Med.*, 2019 WL 4464268, at *4 (quoting *iModules Software, Inc. v. Essenza Software, Inc.*, 2017 WL 6596880, at *2 (Del. Ch. Dec. 22, 2017) (ORDER)).

[59] *Id.* (quoting *Weygandt v. Weco, LLC*, 2009 WL 1351808, at *4 (Del. Ch. May 14, 2009)).

[60] Pl.'s Answering Br., at 31.

[61] Again, this approaches metaphysics. Jacobs' contention is that he should have been issued equity under the Oral Agreement. It is that agreement, not the Operating Agreement, that he contends has been breached. If he had been issued equity, *no live controversy would be before the Court.* No dispute would have "aris[en] out of [the Operating] Agreement." Am. Compl., ¶ 16.

13

1. <u>Direct Benefit</u>

"In evaluating whether a non-signatory received a direct benefit for the purpose of the closely-related test, Delaware courts have deemed both pecuniary and non-pecuniary benefits sufficient to satisfy the test."[62] This Court's case law on this point is clear: to be bound by forum selection clauses, non-signatories must *actually receive* a benefit under or by way of the contract.[63] Defendants in those cases received direct benefits from the contracts like permitted stock transfers,[64] lucrative leases,[65] a seat on a board of directors,[66] or cash.[67] In such a case, an estoppel may arise in light of the knowing acceptance of the benefits of the performance of the contract. However, "the mere 'contemplation' of a benefit" is not the receipt of a benefit for purposes of estoppel.[68]

---

[62] Neurvana Med., 2019 WL 4464268, at *4 (citing *Baker v. Impact Holding, Inc.*, 2010 WL 1931032, at *4 (Del. Ch. May 13, 2010)).

[63] Only one federal case departs from this standard. In *Ninespot, Inc. v. Jupai Holdings Ltd.*, 2018 WL 3626325 (D. Del. July 30, 2018), the court found that because a defendant "*stood to receive the direct benefit* of shares in Plaintiff" through a stock agreement—but had not yet received the shares—it directly benefited from the contract at issue. *Ninespot*, 2018 WL 3626325, at *5 (emphasis added). For reasons explained below, the *Ninespot* case is more properly analyzed under the second prong (foreseeability), is distinguished from this action, and has been repudiated on this point by the Court of Chancery. *See Neurvana Med.*, 2019 WL 4464268, at *7–8.

[64] *Capital Grp. Cos., Inc. v. Armour*, 2004 WL 2521295, at *7 (Del. Ch. Oct. 29, 2004).

[65] *Weygandt v. Weco, LLC*, 2009 WL 1351808, at *5 (Del. Ch. May 14, 2009).

[66] *Baker*, 2010 WL 1931032, at *4.

[67] *McWane, Inc. v. Lanier*, 2015 WL 399582, at *7 (Del. Ch. Jan. 30, 2015).

[68] *Neurvana Med.*, 2019 WL 4464268, at *4 (Del. Ch. Sept. 18, 2019).

Here, by contrast, Jacobs has received no direct benefit from the Operating Agreement. There is no dispute on this fact. SP itself sought a declaration in this lawsuit stating exactly that: "Jacobs (i) owns no equity in the Company, (ii) is not a Member, [and] (iii) owns no Membership Interest in the Company"[69] Jacobs agreed. Any benefits to Jacobs by way of the Operating Agreement are at most contemplated benefits that could result upon the vesting of equity under the Oral Agreement, and not direct benefits. This is clear from the Plaintiff's consistent use of the subjunctive mood in its briefing on this point: "The alleged agreement between Jacobs and SP *would give* him a direct interest in SP"; "Jacobs *would have* all of the benefits and rights under the SP Operating Agreement *if* the contract he alleges was formed"; and "*if* an agreement has been reached, Jacobs *would receive* a direct benefit under the SP Operating Agreement."[70] But Jacobs did not receive these benefits, and the Company denies that he was ever entitled to them. In sum, Jacobs has received no direct—or indirect—benefits through the Operating Agreement. Lacking membership or equity in SP, and with his anticipated contract claim unproven, any benefits the Operating Agreement could bestow on Jacobs are, at most, contemplated benefits.

---

[69] Am. Compl., at 20, Prayer for Relief.

[70] Pl.'s Answering Br., at 31–32 (emphasis added).

## 2. Foreseeability

"The foreseeability inquiry 'rests on the public policy that forum selection clauses promote stable and dependable public relations, and it would be inconsistent with that policy to allow the entities through which one of the parties chooses to act to escape the forum selection clause.'"[71] In *Neurvana Medical, LLC v. Balt USA, LLC*,[72] Vice Chancellor McCormick conducted a scholarly analysis of the applicable case law and concluded that "[a]lthough the direct-benefit and foreseeability inquiries have been articulated as disjunctive, many Delaware cases have relegated the foreseeability inquiry to a subordinate role."[73]

Where, as here, foreseeability must be a "standalone basis" for finding a party "closely related" to a contract, it has been applied only in two scenarios: (1) when non-signatory *defendants* sought to enforce a forum selection clause, and the signatory *plaintiffs* sought to avoid it by arguing the non-signatory defendants lacked standing under the contract;[74] and (2) when a controlled entity is subject to a forum selection clause agreed to by its controller and the controlled entity bears a "clear

---

[71] *Neurvana Med.*, 2019 WL 4464268, at *5 (quoting *Weygandt v. Weco, LLC*, 2009 WL 1351808, at *5 (Del. Ch. May 14, 2009)).

[72] 2019 WL 4464268 (Del. Ch. Sept. 18, 2019).

[73] *Id.* at *5.

[74] *Ashall Homes Ltd. v. ROK Entm't Grp., Inc.*, 992 A.2d 1239, 1249 (Del. Ch. 2010); *Lexington Servs. Ltd. v. U.S. Patent No. 8019807 Delegate, LLC*, 2018 WL 5310261, at *5–6 (Del. Ch. Oct. 26, 2018).

16

and significant connection to the subject matter of the agreement."[75]   As Vice Chancellor McCormick observed, the foreseeability analysis is best narrowly constrained to these two contexts; expanded too far, it "requires rejecting principles of corporate separateness" by broadly haling into Delaware courts those who neither joined an agreement nor received any benefit from it.[76]   In any event, it is clear that Jacobs, an individual defendant, fits neither of these categories.

In *Neurvana Medical*, Vice Chancellor McCormick also addresses a federal case, *Ninespot, Inc. v. Jupai Holdings Ltd.*,[77] that found a non-signatory defendant to be "closely related" based on foreseeability outside of the narrow contexts described above.  In *Ninespot*, the Federal District Court for the District of Delaware found a defendant "closely related" to a contract despite a lack of direct benefits because the defendant "was involved in the planning and negotiation of the [agreement] to such a degree that it could expect to be bound by the agreement."[78] This is aptly dubbed the "active-involvement theory."[79]  In *Neurvana Medical*, Vice Chancellor McCormick found that "[b]y divorcing the foreseeability inquiry from

---

[75] *iModules Software, Inc. v Essenza Software, Inc.*, 2017 WL 6596880, at *3 (Del. Ch. Dec. 22, 2017).

[76] *Neurvana Med.*, 2019 WL 4464268, at *6.

[77] 2018 WL 3626325 (D. Del. July 30, 2018).

[78] *Id.* at *5.

[79] *Neurvana Med.*, 2019 WL 4464268, at *7–8.

17

circumstances in which the signatory controls the non-signatory, *Ninespot* takes the inquiry a step too far," and she declined to apply it.[80]

I agree with Vice Chancellor McCormick's reasoning in *Neurvana Medical*, and I follow it here. Even were I to entertain the active-involvement theory from *Ninespot*, however, it could not support a finding that Jacobs was "closely related" to the SP Operating Agreement. In *Ninespot*, the defendant was the chief negotiator of the contract at issue and referred to it in correspondence with the plaintiff as "our preliminary agreement."[81] Completion of the contract depended on the defendant's funding.[82] Nothing like that is present here. Jacobs did not negotiate any aspect of the Operating Agreement. There is no allegation that he was involved in the creation of the Operating Agreement in any way. Thus, even if *Ninespot*'s holding on this issue were to be followed in this Court, its rationale would not support a finding that Jacobs was "closely related" to the Operating Agreement containing the forum selection clause.

Based on the above, I find that Jacobs is not a closely related party to the Operating Agreement, as required by our case law to find a non-signatory bound by a forum selection clause. Because of this finding, I need not address the third prong

---

[80] *Id.* at *8.

[81] *Ninespot*, 2018 WL 3626325, at *5–6.

[82] *Id.*

of the analysis, whether "the claim arise[s] from [the defendant's] standing relating to the . . . agreement."[83] SP asserts no other bases for personal jurisdiction besides consent to the forum selection clause in the Operating Agreement. Having found that this clause does not bind Jacobs, I conclude that this Court lacks personal jurisdiction. I therefore grant Jacobs' motion to dismiss under Rule 12(b)(2).

*B. Subject Matter Jurisdiction*

Having found that this Court lacks personal jurisdiction over the Defendant, his motion to dismiss under 12(b)(1) based on subject matter jurisdiction is moot.

### III. CONCLUSION

Based on the foregoing, I grant the Defendant's Motion to Dismiss for lack of personal jurisdiction under Chancery Court Rule 12(b)(2). An appropriate order is attached.

---

[83] *Capital Grp. Cos., Inc. v. Armour*, 2004 WL 2521295, at *5 (Del. Ch. Oct. 29, 2004) (citing *Hadley v. Shaffer*, 2003 WL 21960406, at *4 (D. Del. Aug. 12, 2003)). In its briefing, SP relied heavily on *PPL Corp. v. Riverstone Holdings LLC*, 2019 WL 5423306 (Del. Ch. Oct. 23, 2019) to argue that Jacobs' claim arises out of the Operating Agreement because the Operating Agreement will have to be interpreted and construed to resolve the claim, no matter where it is brought. Pl.'s Answering Br., at 33–34. I note that personal jurisdiction was not at issue in *Riverstone Holdings*; the defendants there sought to dismiss for venue reasons in favor of a first-filed action in another state under the *McWane* doctrine. In any event, whether or not some aspect of relief Jacobs might seek could be said to "arise out of" the Operating Agreement is immaterial in light of my findings above.

19

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| SUSTAINABILITY PARTNERS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) C.A. No. 2019-0742-SG | |
| | ) | |
| JOEL JACOBS, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

AND NOW, this 11th day of June, 2020, for the reasons set forth contemporaneously in the attached Memorandum Opinion dated June 11, 2020, IT IS HEREBY ORDERED that the Defendant's Motion to Dismiss is GRANTED.

IT IS SO ORDERED.

/s/ Sam Glasscock III

Vice Chancellor